Argued and submitted on September 24, 2020, resubmitted en banc March 29, reargued and submitted August 3, 2022; convictions on Counts 1 through 5 reversed, convictions on Counts 6 through 9 reversed and remanded with instruction to enter a judgment of conviction for one count of first-degree unlawful sexual penetration (Count 6) and one count of first-degree sexual abuse (Count 7), remanded for resentencing, otherwise affirmed March 22, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CESAR PARRA-SANCHEZ,
*Defendant-Appellant.*

Washington County Circuit Court
18CR25111; A169096

527 P3d 1008

In this criminal appeal, defendant challenges his conviction for several counts of using his daughter in a display of sexually explicit conduct, ORS 163.670. Defendant assigns error to the trial court's denial of his motion for judgment of acquittal for those counts, contending that a "lewd exhibition," as defined in the relevant statute, requires more than mere passive observation of nudity. Defendant also contends that several Court of Appeals cases related to the definition of "lewd exhibition" were wrongly decided because they foreclosed consideration of whether an exhibition was objectively lewd. Finally, defendant contends the trial court plainly erred in failing to merge several sexual abuse counts. *Held*: The Court of Appeals concluded that the previous construction of "lewd exhibition" was inconsistent with the text, context, or the legislative history of the child pornography laws. The court held that the legislature intended that the term "lewd exhibition" be determined by reference to objective standards. The court concluded that the evidence in this case did not support a conclusion that a lewd exhibition occurred according to objective standards, and therefore the trial court erred by denying the motion for judgment of acquittal. The court further concluded that the trial court plainly erred by entering separate convictions on several counts that should have been merged. Aoyagi and Kamins, JJ., and James, J. pro tempore, wrote concurring opinions, and Powers, Mooney, and Hellman, JJ., wrote dissenting opinions.

Convictions on Counts 1 through 5 reversed; convictions on Counts 6 through 9 reversed and remanded with instruction to enter a judgment of conviction for one count of first-degree unlawful sexual penetration (Count 6) and one count of first-degree sexual abuse (Count 7); remanded for resentencing; otherwise affirmed.

En Banc

Eric Butterfield, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services, argued the cause

and filed the supplemental brief for appellant. Also on the opening brief was Joshua B. Crowther, Chief Deputy Defender.

Jonathan N. Schildt, Assistant Attorney General, argued the cause for respondent. Also on the supplemental brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General. On the opening brief were Rolf C. Moan, Assistant Attorney General, Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Chief Judge, Ortega, Egan, Tookey, Shorr, Aoyagi, Powers, Mooney, Kamins, Pagán, Joyce, and Hellman, Judges, and James, Judge pro tempore.

PAGÁN, J.

Convictions on Counts 1 through 5 reversed; convictions on Counts 6 through 9 reversed and remanded with instruction to enter a judgment of conviction for one count of first-degree unlawful sexual penetration (Count 6) and one count of first-degree sexual abuse (Count 7); remanded for resentencing; otherwise affirmed.

Pagán, J., filed the opinion of the court in which Lagesen, C.J., Ortega, Egan, Aoyagi, Kamins, JJ., and James, J. pro tempore, joined.

Aoyagi, J., concurred and filed an opinion in which Pagán, J., joined.

Kamins, J., concurred and filed an opinion in which Lagesen, C.J., and Pagán, J., joined.

James, J. pro tempore, concurred and filed an opinion.

Powers, J., dissented and filed an opinion in which Shorr, J., joined.

Mooney, J., dissented and filed an opinion.

Hellman, J., dissented and filed an opinion in which Tookey and Joyce, JJ., joined.

**PAGÁN, J.**

Defendant was convicted of multiple sex crimes involving his minor daughter. Among those crimes were four counts under ORS 163.670, Oregon's prohibition on the creation of pornography using children, using a child in display of sexually explicit conduct (hereinafter "display"), and one count of attempted display (collectively, the "display counts"). Those crimes were based on defendant's conduct of, depending on the circumstances, entering the bathroom while his daughter was showering or her bedroom when she was not fully dressed, and observing her in a state of full or partial undress. During trial, defendant moved for a judgment of acquittal on the display counts. In opposing that motion, the state, using our prior case law, successfully argued that the trier of fact was required to determine whether there was a "lewd exhibition of sexual or other intimate parts" based solely on defendant's subjective intent. We now consider whether, when properly construed, ORS 163.670 and the definitional statute attendant to that statute, ORS 163.665, support that formulation. For the reasons that follow, we conclude that the answer to that question is no. In so doing, we disavow our prior case law to the extent that it points to or otherwise might require a different conclusion. We therefore reverse defendant's convictions on the display counts and remand for entry of judgment of acquittal on those counts. We also reverse the convictions on Counts 8 and 9, and remand for merger of the guilty verdicts on those counts with Counts 6 and 7, respectively.

## I.  BACKGROUND

As this case is before us following the denial of defendant's motion for judgment of acquittal, we review the entire record and draw all reasonable inferences in favor of the judgment. *State v. Waterhouse*, 359 Or 351, 353, 373 P3d 131 (2016). Our job is to determine whether a rational factfinder could have found each element of the crime to have been proved beyond a reasonable doubt. *State v. Reed*, 339 Or 239, 243, 118 P3d 791 (2005). We state the factual background adduced at trial in accordance with that standard.

Defendant was convicted of a number of sexual offenses against his minor daughter, M. The primary dispute on appeal concerns only five of those convictions: the convictions for use, and attempted use, of a child in a display of sexually explicit conduct, in violation of ORS 163.670. We therefore limit our recitation of the facts to those relevant to those convictions.

While defendant and his family lived in various apartments in Beaverton, defendant would walk into M's bedroom after she showered. M would typically take a shower, then walk down the hall to her bedroom wearing a towel, before getting dressed in her bedroom. Although defendant did not come into M's room every time she showered, he did once or twice a week. Defendant would wait a few minutes after she went to her bedroom, and then would open the door, without knocking, and enter. Usually, by the time defendant entered, M had taken off the towel and was "completely exposed." M would "try to cover" herself but could only cover the "front" "private, intimate parts" of her body. She was generally unable to cover her buttocks. M would sit down on the bed, covered with a towel, and would not get dressed until after defendant left the room. Defendant would often "pretend to fix things or whatever," such as the circuit breaker that was in M's bedroom, while M sat on the bed covered with a towel. On one occasion, M asked defendant to leave and he said "I can do whatever I want. I pay the rent."

When defendant would walk into M's bedroom, he would first look directly at M, but later, as he looked around the room, he would look at M's reflection in the mirror on the closet door. M could tell defendant was looking at specific body parts because she could see where his eyes were directed. Defendant was able to observe M's breasts, vaginal area, and buttocks. On a different occasion, M was washing her hair in the shower when defendant opened the shower curtain partially and looked up and down M's body at a distance of about two feet.

Ultimately, M reported the conduct described above, along with other conduct by defendant, to police. M also reported that defendant had sexually abused her once

by digitally penetrating her vagina. Defendant was charged with multiple sex offenses, including four counts of using a child in a display of sexually explicit conduct and one count of attempted using a child in a display.[1]

For the display counts, the state alleged that defendant, in violation of ORS 163.670, "did unlawfully and knowingly employ, authorize, permit, compel or induce [M], a child, to participate in or engage in sexually explicit conduct for a person to observe." The state's theory was that the "sexually explicit conduct" was the "lewd exhibition of sexual or other intimate parts" under ORS 163.665(3)(f). At trial, after the state presented its case-in-chief, defendant moved for judgment of acquittal on each of the display counts. Citing *State v. Meyer*, 120 Or App 319, 852 P2d 879 (1993), *State v. Evans*, 178 Or App 439, 37 P3d 227 (2001), *rev den*, 334 Or 76 (2002), and *State v. Smith*, 261 Or App 665, 322 P3d 1129, *rev den*, 355 Or 880 (2014), defendant argued that an individual must take some affirmative action with respect to the child to make an exhibit of the child's sexual or intimate parts and that the conduct at issue did not amount to a "lewd exhibition." Quoting a dissent in *Evans*, defendant contended that "[t]he proper focus under the statute is on whether the manner in which the children's genitals were displayed would be considered lewd from the perspective of the average person viewing the exhibition." 178 Or App at 449 (Armstrong, J., dissenting). The crux of defendant's argument was that the question of whether a person has caused a child to engage in a "lewd exhibition" cannot be answered by exclusively looking in the mind of the viewer. In opposition, citing our case law, the state argued to the trial court that, when considering whether the state had proven a "lewd exhibition," the trier of fact could only look at a defendant's subjective intent, and because the state had evidence that this defendant was sexually aroused by the child, it had met its burden.

The trial court denied the motions for judgment of acquittal without explanation. The court noted later, when

[1] In addition, defendant was charged with one count of first-degree unlawful sexual penetration, ORS 163.411 (Count 6); one count of first-degree sex abuse, ORS 163.427 (Count 7); one count of second-degree sex abuse, ORS 163.425(1)(a) (Count 8); and one count of third-degree sex abuse, ORS 163.415 (Count 9).

announcing its findings and ruling defendant guilty, that although it was not clear to it that the terms of the statute encompassed defendant's conduct, it viewed our cases as extending the statute to reach defendant's conduct:

> "The legal issue regarding Counts 1 [through] 5 was tricky for me. If I was left to read the statute myself, I don't know that I would decide that it was applicable to [defendant's] conduct.

> "But the Court of Appeals has made it clear that they read it differently than me. I'm following their lead."

On appeal, defendant assigns error to the trial court's denial of his motion for judgment of acquittal on the display and attempted display counts, arguing that the legislature did not intend ORS 163.670 "to apply to the passive observation of a person undressing." The state responds that, under our case law, whenever a person views a child's genitals or other intimate sexual parts for the purpose of sexual gratification, the person has "permitted" the child to participate or engage in a display constituting a "lewd exhibition" in violation of ORS 163.670, regardless of the objective nature of that display.

After this case was argued before a department of this court and submitted for decision, we voted to take the case en banc and invited the parties to submit supplemental briefs addressing specific questions and requested that the parties re-argue the case to the full court. In that briefing, defendant reiterates his argument that his conduct does not fall within the statute and, in particular, asserts that whether a child is engaged in a lewd exhibition must be determined from an objective standpoint. Defendant suggests that our prior cases are wrong to the extent they suggest that a child in a state of undress is engaged in a lewd exhibition whenever a person observes the child for the purpose of sexual gratification.

The state, in its supplemental brief, now contends that "what qualifies as a lewd exhibition will depend in part on evidence of the objective qualities and circumstances of the image or live depiction." Although the state does not explicitly reject its prior position that a lewd exhibition is determined exclusively by the subjective intent of the

defendant, we understand the state's shift as a tacit admission that "lewd exhibition" must contain an objective component, contrary to our prior case law holding otherwise.

## II. DISCUSSION

To resolve whether defendant violated the display statute, we must decide whether the sexual gratification of the accused is alone sufficient to transform observation of a nude child into a "lewd exhibition of sexual or other intimate parts." If it is, then the state presented sufficient evidence to withstand defendant's motion for judgment of acquittal because there was evidence that defendant took action to see a child in a state of undress and that he harbored sexual desire for his daughter. But as the text, context, and legislative history reveal, the legislature did not intend such a result. Rather, the state must prove that the exhibition of a child's sexual or intimate parts was *objectively* lewd, not simply that defendant found it to be sexually gratifying. Our conclusion is guided not only by our principles of statutory interpretation, but also the need to interpret our statutes in a manner that passes constitutional muster. We further conclude that because our jurisprudence on this issue is not consistent with those principles, we disavow those cases today. That leads us to the ultimate conclusion that, in this case, the state did not meet its burden on the display counts, and defendant's motion for a judgment of acquittal on those counts should have been granted.

Before moving to the analysis, we address the dissent of Judge Powers that suggests that considering our prior case law, and disavowing it, is unwarranted because the opening brief did not raise that particular argument. 324 Or App at 775-76 (Powers, J., dissenting). The dissent's conclusion overlooks the events that led to our consideration of this particular issue. As noted above, during trial, when moving for a judgment of acquittal on the display counts, counsel specifically argued the very point we reach today: that our case law after *Meyer* incorrectly construed the display statute, and that defendant's conduct was not intended to be captured by those statutes. The opening brief did not rely on that *argument* but did rely on the error that we address today: the trial court's denial of a motion for judgment of

acquittal, rejecting the argument that defendant's conduct was not intended to be captured by the display statutes. When the case was referred en banc, the problematic nature of our case law became apparent, and we asked the parties to weigh in on the statutory interpretation issue, providing a second round of briefing and oral arguments. We thus conclude that the statutory interpretation issue was preserved, and our duty to correctly interpret statutes, regardless of the particular arguments raised by the parties, necessitates the reconsideration of our jurisprudence. *State v. Vallin*, 364 Or 295, 300, 434 P3d 413, *adh'd to as modified on recons*, 364 Or 573, 437 P3d 231 (2019) ("At bottom, the issue here is one of constitutional interpretation, and this court is duty-bound to interpret the law correctly, without regard to the parties' arguments or lack thereof."); *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997).

Our goal in interpreting a statute is to discern the intent of the legislature in enacting the statute. ORS 174.020(1)(a) ("In the construction of a statute, a court shall pursue the intention of the legislature if possible."). "[T]here is no more persuasive evidence of the intent of the legislature than the words by which the legislature undertook to give expression to its wishes." *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009) (internal quotation marks omitted). We examine "the text of the statute in its context, along with relevant legislative history, and, if necessary, canons of construction." *State v. Cloutier*, 351 Or 68, 75, 261 P3d 1234 (2011) (citing *Gaines*, 346 Or at 171-73). "In the absence of any evidence to the contrary, we assume that the legislature intended to give those words their 'plain, natural, and ordinary meaning,'" relying on dictionaries that were in use at the time the statute was enacted. *State v. Ziska / Garza*, 355 Or 799, 804-05, 334 P3d 964 (2014).

A.   *Text and Context*

ORS 163.670(1) provides:

"A person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels or induces a child to participate or engage in *sexually explicit conduct* for any person to observe or to record in a visual recording."

(Emphasis added.) As relevant here, "sexually explicit conduct" is defined as the "actual or simulated *** lewd exhibition of sexual or other intimate parts." ORS 163.665(3)(f). Accordingly, we must determine the meaning of the phrase "lewd exhibition."

"Lewd," used as an adjective, carries two likely meanings, both of which are pertinent to our discussion. First, lewd can mean "sexually unchaste or licentious: DISSOLUTE, LASCIVIOUS." *Webster's Third New Int'l Dictionary* 1301 (unabridged ed 2002). Second, lewd can mean "suggestive of or tending to moral looseness: inciting to sensual desire or imagination: INDECENT, OBSCENE, SALACIOUS." *Id.*; *see also Meyer*, 120 Or App at 326. Exhibition, in turn, can mean "an act or instance of showing, evincing, or showing off," or, similarly, "a public show or showing." *Websters* at 796.[2] Thus, the natural meaning of the phrase "lewd exhibition" is a showing of something lascivious or salacious.

That understanding is consistent with the structure of ORS 163.665. ORS 163.665(3) defines "sexually explicit conduct" to encompass six forms of conduct, including "lewd exhibition." As is often the case when considering the possible meanings of one term in a list of many, the meaning of the word or term in question can be clarified by reference to the other words or terms in the same provision. *Daniel N. Gordon, PC v. Rosenblum*, 361 Or 352, 365, 393 P3d 1122 (2017) (explaining the textual canon of *noscitur*

---

[2] All of our cases on "lewd exhibition" up to this point have involved overt presentations or recordings, and they have not tested what is needed to qualify as an "exhibition." *See State v. Cazee*, 308 Or App 748, 482 P3d 140 (2021) (photographs); *State v. Rockett*, 302 Or App 655, 463 P3d 1 (2020), *rev'd on other grounds*, 368 Or 510, 492 P3d 66 (2021) (hidden cameras); *State v. Bates*, 304 Or App 732, 472 P3d 768 (2020) (staging a recording); *State v. Horseman*, 294 Or App 398, 432 P3d 258 (2018), *rev den*, 364 Or 723 (2019) (inducing a child to masturbate while defendant watched); *State v. Carey-Martin*, 293 Or App 611, 430 P3d 98 (2018) (defendant requested nude photos from minor); *State v. Howe*, 273 Or App 518, 359 P3d 483 (2015) (photographs); *State v. Hunt*, 270 Or App 206, 346 P3d 1285 (2015) (defendant requested nude photograph from victim); *State v. Richardson*, 261 Or App 95, 323 P3d 311, *rev den*, 355 Or 880 (2014) (photographs); *Smith*, 261 Or App at 671 (photographs); *Smith v. Franke*, 266 Or App 473, 337 P3d 986 (2014), *rev den*, 356 Or 689 (2015) (photographs); *State v. Cale*, 263 Or App 635, 330 P3d 43 (2014) (photographs); *State v. Porter*, 241 Or App 26, 249 P3d 139, *rev den*, 350 Or 530 (2011) (staging sexual acts while others observed); *Evans*, 178 Or App at 442 (staging victim to undress while defendant watched); *Meyer*, 120 Or App at 322 (photographs).

*a sociis*). In so doing, we presume, absent contrary indications, that the legislature intends that terms contained in a single provision share a theme or characteristic common to all of the terms in the provision. *King City Rehab, LLC v. Clackamas County*, 214 Or App 333, 340-41, 164 P3d 1190 (2007). As ORS 163.665(3) contains no indications to the contrary, that presumption suggests that "lewd exhibition" should be interpreted to mean conduct comparable to "sexual intercourse," "penetration," "masturbation," or "sadistic or masochistic abuse."[3] Thus, the context confirms that the legislature intended that the common meaning of "lewd" as something overtly lascivious or salacious applies.[4]

Taken together, and appropriately circumscribed by the meanings common to other "sexually explicit conduct," the term "lewd exhibition" would suggest to the ordinary reader that it means a display or showing of sexual or other intimate parts that is itself salacious or focused on sex. Thus, mere nudity can be encompassed in the definition of "lewd exhibition" when it can be said to be lascivious or salacious—not simply nudity in the context of ordinary, daily activities such as showering or dressing.

Our textual analysis is also guided by the fact that the statute at issue is a criminal statute. The legislature has directed that a criminal statute "shall be construed according to the fair import of its terms, to promote justice and to effect the purposes stated in subsection (1) of this section." ORS 161.025(2). Particularly relevant here, among the purposes identified in subsection (1), is "[t]o give fair warning of the nature of the conduct declared to constitute an offense and of the sentences authorized upon conviction."

---

[3] As we explain below, interpreting lewd exhibition in such a circumscribed manner may be constitutionally required.

[4] One further contextual clue about whether the legislature intended the "lewd exhibition of sexual or other intimate parts" definition to be focused on an objective or subjective determination exists in the definition of "sexual contact" for general sexual offenses. At the time the legislature was considering amending the child pornography statutes, the legislature had already included language about a defendant's subjective sexual desires in other definitional statutes about sex crimes: "'sexual contact' means any touching of the sexual or other intimate parts of a person or causing such person to touch the sexual or other intimate parts of the actor *for the purpose of arousing or gratifying the sexual desire of either party*." ORS 163.305(6) (1983) (emphasis added). No such language was included in ORS 163.665 or ORS 163.670.

ORS 161.025(1)(c). The requirement that ambiguous criminal statutes be construed in favor of providing a "fair warning of the conduct declared to constitute an offense" helps to ensure that Oregon courts do not construe ambiguous criminal statutes in a way that risks violating a defendant's right to due process. *State v. Duggan*, 290 Or 369, 373, 622 P2d 316 (1981). That principle too, supports a construction of lewd exhibition that includes a display of something objectively salacious such that a person has fair warning as to what conduct is prohibited.

## B.   *Legislative History*

Legislative history likewise supports the conclusion that "lewd exhibition" encompasses a display that is lascivious in an objective sense. Oregon's enactment came during the broader national conversation addressing what sorts of displays could be prohibited in view of the First Amendment's protections, as legislatures around the country, including the federal government, were actively seeking to curb the sexual exploitation and abuse of children.

Specifically, Oregon had initially enacted a statute prohibiting the use of a child in an obscene sexual performance in 1979, largely incorporating the obscenity standard set forth by the United States Supreme Court in *Miller v. California*, 413 US 15, 24, 93 S Ct 2607, 37 L Ed 2d 419 (1973).[5] *See* Or Laws 1979, ch 706, §§ 2-5. That standard

---

[5] The applicable definitions included Oregon Laws 1979, chapter 706, section 3 (codified as *former* ORS 163.477, *repealed by* Or Laws 1985, ch 557, § 10), which provided:

"(1)  Sexual conduct or a sexual performance is obscene if:

"(a)  It depicts or describes in a patently offensive manner   sadomasochistic abuse or sexual conduct;

"(b)  The average person applying contemporary state standards would find the work, taken as a whole, appeals to the prurient interest in sex; and

"(c)  Taken as a whole, it lacks serious literary, artistic, political or scientific value.

"(2)  'Sexual conduct' has the meaning given that term in subsection (10) of ORS 167.060."

ORS 167.060(10) defined "sexual conduct" as

"human masturbation, sexual intercourse, or any touching of the genitals, pubic areas or buttocks of the human male or female, or the breasts of the female, whether alone or between members of the same or opposite sex or between humans and animals in an act of apparent sexual stimulation or gratification."

recognized that, although expressive content even of a sexual nature is protected by the First Amendment, a limited category of conduct classified as "obscene" could be penalized. Consistent with that limitation, Oregon law only prohibited child pornography to the extent it could be characterized as "obscene."

The current language of the statute arose following the United States Supreme Court's expansion of the type of conduct that could be regulated without offending the First Amendment. In *Ferber*, the Supreme Court held that child pornography was outside of the protection of the First Amendment, and because of that conclusion, prosecutors no longer had to prove that material was "obscene" under the standards described in *Miller*. *New York v. Ferber*, 458 US 747, 764, 102 S Ct 3348, 73 L Ed 2d 1113 (1982).

It was the *Ferber* expansion that spurred the Oregon legislature to consider Senate Bill (SB) 375 in 1985. During a hearing on SB 375, Senator Tony Meeker, a principal sponsor of SB 375, expressed that the legislation would amend Oregon's existing child pornography laws to bring those laws as close as possible to what the Supreme Court approved in *Ferber*. The focus, explained Meeker, of the proposed legislation was to remove the obscenity test that had been previously imposed by applicable First Amendment law in favor of the post-*Ferber* standard. Tape Recording, Senate Committee on Judiciary, SB 375, Apr 25, 1985, Tape 110, Side A (statement of Sen Meeker). Meeker noted that SB 375 had been "patterned identically after those laws that have been upheld by the [*Ferber*] case, with very careful drafting." Tape Recording, Senate Committee on Judiciary, SB 375, Apr 25, 1985, Tape 112, Side A (statement of Sen Meeker).

The discussions about SB 375 make two things apparent. First, the measure was intended to punish people for their conduct related to the creation of child pornography, and the underlying abuse or exploitation of children, not necessarily the visual depictions themselves. Tape Recording, Senate Committee on Judiciary, SB 375, Apr 25, 1985, Tape 111, Side A (statements of Sen L.B. Day, Sen Margie Hendriksen, and American Civil Liberties Union of Oregon President Rex Armstrong). Second, the adoption of

the measure was governed by an understanding that the constitution stops the state from criminalizing thoughts alone. Tape Recording, Senate Committee on Judiciary, SB 375, Apr 25, 1985, Tape 111, Side A (statements of Sen Hendriksen and Armstrong). Senator Hendriksen remarked that "a person's ideas or their imagination [cannot be punished] but when you are using children, not ideas, you are using children who are portrayed in movies or in photographs as stimulus, it's not [the same] as a person's work product being put in print." Tape Recording, Senate Committee on Judiciary, SB 375, Apr 25, 1985, Tape 111, Side A (statement of Sen Hendriksen).

Although not determinative as to the intent of the legislature that enacted the current language, subsequent legislative history of the language is informative.[6] In 1991, House Bill (HB) 2681 was proposed to criminalize possession of child pornography. The original text of HB 2681 proposed to amend the lewd exhibition element to read "lewd exhibition of, *or graphic focus on*, the genitals or anus." *See* HB 2681 § 4 (1991) (emphasis added). In committee discussions regarding the term "graphic focus" as part of the amendment, Warren Deras, principal drafter of the bill, explained that the term came from the United States Supreme Court's decision in *Osborne v. Ohio*, 495 US 103, 110 S Ct 1691, 109 L Ed 2d 98 (1990), that permitted state regulation of mere possession of child pornography. Tape Recording, Senate Committee on Judiciary, HB 2681, May 29, 1991, Tape 195, Side A (statement of Deras). Even absent the addition of "graphic focus," Deras explained that "the definition of 'sexually explicit conduct' as a whole is not intended to and does not have the effect of prohibiting mere nudity, including nudity that displays the genitals because of the fact that

---

[6] In 1987, a proposal was made to replace "lewd exhibition of the genitals" with several other provisions that targeted certain conduct "for the purpose of sexual stimulation of the viewer." A sponsor of the measure, Senator Jim Simmons, testified that the amendment would "bring in a new set of definitions which greatly expand ORS 163.665." Tape Recording, Senate Committee on Judiciary, SB 364, June 9, 1987, Tape 175, Side B (statement of Sen Simmons). Although SB 364 was eventually adopted, the proposed amendments to the existing "lewd exhibition" definition of ORS 163.665 were not. The enacted version of SB 364 included, as a definition of "sexually explicit conduct," "lewd exhibition of the genitals or anus." The broader definitional term "sexual conduct" from the 1985 enactment was amended in 1987 to read "sexually explicit conduct."

nudity involved children." *Id.* Deras refuted a question from Senator Dick Springer suggesting that the bill was "trying to get in the head of the person that's actually viewing it and for what purpose" by noting that "quite frankly, one of the things we don't want to do in this statute is to have to go into the person's head and look at motivation." *Id.* Perhaps presciently, Deras explained:

> "You always get the difficulty when you are dealing with the area of obscenity versus pornography versus something that is neither, of the 'I know it when I see it' syndrome. This is material that is extraordinarily difficult to define, but I think again if you look at the definition as a whole, and you are looking at extremely restrictive language that requires something far beyond total nudity."[7]

*Id.* The graphic focus addition was eventually abandoned, in part because of concern about the breadth that such language could cover. Senator Jim Bunn noted,

> "I think it was Warren Deras that was speaking, saying we don't really want this bill to apply, for example to somebody who's taking a picture of their kid running naked on the beach, and that was not the intent that happen, but I think he was admitting that it was possible."

Tape Recording, Senate Committee on Judiciary, HB 2681, June 5, 1991, Tape 212, Side B (statement of Sen Bunn).

Although the legislature never precisely defined what a lewd exhibition of sexual or other intimate parts entailed, the legislative history of the original 1985 enactment and subsequent amendments reveal a number of salient points to provide boundaries in our consideration of the term.[8]

---

[7] The difficulty of precisely defining the prohibited conduct without also including innocent behavior was noted by Deras in an earlier hearing.

> "I hate to confess this, but after my second draft of this bill, I realized I had made it illegal for my wife to show me how to use a rectal thermometer. And having had to learn that with two children, the definition of explicit sexual conduct involving a child was actually changed."

Tape Recording, Senate Committee on Judiciary, HB 2681, May 29, 1991, Tape 195, Side A (statement of Deras).

[8] The 1997 and 2011 amendments and associated legislative history provide no discussion meaningful to our analysis of sexually explicit conduct or lewd exhibition.

First, as demonstrated in the history of the 1987, 1991, and 1995 amendments, Oregon's legislature has steadfastly rejected attempts to inject a purely subjective, sexual-purpose-based inquiry into the definitions of sexually explicit conduct (1987) or lewd exhibition (1991 and 1995). Even during the original enactment in 1985, there was concern over drafting legislation that targeted a person's ideas rather than the actual child sex abuse that was inherent in creating and distributing child pornography.

Second, in both the 1991 and 1995 amendments, the applicable committees heard testimony from legislation drafters, sponsors, and prosecutors that lewd exhibition meant something far more than mere nudity. "A picture of a child lying on a rug or running around, that's not a lewd exhibition." Tape Recording, Senate Committee on Judiciary, HB 2681, June 5, 1991, Tape 212, Side B (statement of Rep Kevin Mannix). A reasonable inference from those concerns is that, by focusing on *what* is being displayed (*i.e.*, nudity or partial nudity), the objective nature of a display determines whether something is a lewd exhibition, and not the personal sexual preferences or desires of the creator.

Finally, we conclude that United States Supreme Court case law mandates that conclusion. Although federal case law is not always probative of the intent of the Oregon legislature, it is with respect to this statute. That is because, as the legislative history shows, the legislature drafted the statutory language with the purpose of complying with *Ferber*.

Beginning in the 1950s, the United States Supreme Court issued a number of opinions that delineated the boundaries of material that was protected under the First Amendment from material that was not protected. *See Miller*, 413 US at 19 (collecting cases). The culmination of that history came in *Miller*, which held that "obscene material is unprotected by the First Amendment," and those materials were "works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value." *Id*. at 23-24. Further, the Court noted that "no one will be

subject to prosecution for the sale or exposure of obscene materials unless these materials depict or describe patently offensive 'hard core' sexual conduct." *Id.* at 27.

In 1982, the United States Supreme Court decided *Ferber.* Due to the tension between laws seeking to proscribe child pornography on the one hand, and First Amendment protections on the other, the Court noted that to be constitutionally permissible,

> "the conduct to be prohibited must be adequately defined by the applicable state law, as written or authoritatively construed. Here the nature of the harm to be combated requires that the state offense be limited to works that *visually* depict sexual conduct by children below a specified age. The category of 'sexual conduct' proscribed must also be suitably limited and described."

458 US at 764 (emphasis in original; footnote omitted). The Court then described the reformulated *Miller* standard, as it applied to child pornography, to eliminate the "prurient interest" requirement, remove the "patently offensive" requirement, and allow consideration of only a part, rather than the whole of a work. *Id.* at 764-65. Finally, the Court considered, and approved, the New York statute giving rise to the case, which stated "'sexual conduct' means actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals." Critically, for our consideration, the Court noted that "lewd exhibition of the genitals" was a common and permissible regulation with respect to sexual conduct. *Id.* at 765 (citing *Miller*, 413 US at 25). The Court did not expand on what precisely constituted a lewd exhibition, but by approving New York's definition including the phrase, we may surmise it was "suitably limited and described."

Later, in *United States v. Williams*, 553 US 285, 296-97, 128 S Ct 1830, 170 L Ed 2d 650 (2008), the Court explained that the federal law in question was very similar to the New York law approved in *Ferber*, but noted that "[i]f anything, the fact that the defined term here is 'sexually explicit conduct,' rather than (as in *Ferber*) merely 'sexual conduct' renders the definition more immune from facial constitutional attack." In other words, by inserting "explicit"

into the definition, as has Oregon, the qualifying conduct may have been narrowed. The *Williams* Court also emphasized that what is critical for whether a lascivious exhibition exists is the content of the work (or live performance), not what someone subjectively believes about it. *Id.* at 301. "Where the material at issue is a harmless picture of a child in a bathtub and the defendant, knowing that material, erroneously believes that it constitutes a 'lascivious exhibition of the genitals,' the statute has no application." *Id.* "[The] material in fact (and not merely in [a defendant's] estimation) must meet the statutory definition." *Id.*

In sum, *Ferber* explained that "lewd exhibition of the genitals," as construed in *Miller*, referred to "the hard core of child pornography." *Ferber*, 458 US at 764-65, 773; *Miller*, 413 US at 25. *Williams* reaffirmed that understanding, and added that if anything, "sexually explicit conduct" is narrower than the phrase "sexual conduct" approved in *Ferber*. *Williams*, 553 US at 296-97. And *Williams* confirmed that no matter what an individual believed about a photograph, unless that photograph was in fact objectively lascivious, "the statute has no application." *Id.* at 297.[9]

Given the constitutional minefield we traverse, and considering the text, context, and legislative history of the phrase "lewd exhibition" in Oregon law, we cannot adopt a different interpretation than that embraced by the Supreme Court in *Ferber*. That definition tracks with the ordinary meaning of the words, and, consequently, provides fair notice of what a "lewd exhibition" is, as required by the Oregon criminal code and federal due process.

## C.   *Prior Judicial Construction*

Our case law interpreting this statute has not adhered to these principles. Our first case concerning "lewd

---

[9] The First Amendment requires the state to prove *scienter* for prohibitions on child pornography. *Osborne*, 495 US at 115. That requirement includes some culpable mental state for the nature of the prohibited content. *Ferber*, 458 US at 765 (citing *Smith v. California*, 361 US 147, 154-55, 80 S Ct 215, 4 L Ed 2d 205 (1959) (state may not impose criminal penalties on distribution of obscene material without *scienter*); *Hamling v. United States*, 418 US 87, 122, 94 S Ct 2887, 41 L Ed 2d 590 (1974) ("A reading of the (New York) statute *** as a whole clearly indicates that only those who are in some manner aware of the character of the material they attempt to distribute should be punished. It is not innocent but calculated purveyance of filth which is exorcised.").

exhibition," *Meyer*, laid the groundwork upon which our later cases were based and was decided under an earlier version of the definition. It did so, however, not in the context of construing the display statute but, instead, in addressing a vagueness challenge to the definition of sexually explicit conduct.

In *Meyer*, we began our analysis by noting that "[t]o withstand a vagueness challenge, the terms of a criminal statute 'must be sufficiently explicit to inform those who are subject to it of [*sic*] what conduct on their part will render them liable in penalties.'" 120 Or App at 324 (quoting *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985)) (*sic* added by *Meyer*). We went on to note that a person "need only be able to have a reasonable degree of common understanding of what is forbidden by the statute." *Meyer*, 120 Or App at 324 (quotation marks omitted).

Surveying legal and dictionary definitions of "lewd" or "lewdness," we concluded that although the definitions were not identical, "they contain sufficient common elements that indicate with reasonable certainty the nature and character of the conduct forbidden by ORS 163.670 and ORS 163.673." *Id*. at 326. In making that determination, we also looked to federal cases addressing vagueness challenges to comparable statutes to conclude that "lewd" was a "commonsensical term," meaning indulgence of lust, immorality relating to sexual impurity, and gross or wanton indecency with respect to sexual relations. *Id*. at 325 n 7, 326 n 10. From those sources, we concluded that a "lewd exhibition" "refers to sexually motivated conduct; specifically, it imports the excitement of lust or sexual desire and signifies gross indecency in sexual behavior." *Id*. at 326. Thus, we explained: "We interpret the phrase 'lewd exhibition of the genitals or anus' in ORS 163.670 and ORS 163.673 [*sic*: ORS 163.665] to mean exhibition with the intent of stimulating the lust or sexual desires of the person who views it." *Id*. at 326. Thus, *Meyer* stands for the minor proposition that "lewd exhibition" is an objective term with a common meaning, and the major proposition that the statutes using the term are not vague because they require proof that in engaging in conduct that results in a child's "lewd exhibition," the defendant had the intent of stimulating the lust or sexual desires of the viewer.

In *Evans*, we looked to *Meyer* when called upon to determine whether the evidence was sufficient to allow a finding that the defendant had used a child in a "lewd exhibition of sexual or other intimate parts." 178 Or App at 443-44. In *Evans*, the defendant challenged the sufficiency of the evidence that he had knowingly used a child in a display of sexually explicit conduct. *Id*. at 441. There, the defendant, while naked, "initiated and induced" a child to remove her clothing in the presence of other family members who also were naked, "volunteered to teach her how to dance," and danced with her "holding her so closely that his genitals were pressed against her stomach." *Id*. at 441, 445. There, the defendant, citing *Meyer*, argued that there was no "lewd exhibition" because the state failed to show that the defendant's conduct in inducing the child to dance with him was undertaken with the intent of stimulating the lust or sexual desires of the person who viewed it. *Evans*, 178 Or App at 443. The defendant there argued that nothing about the exhibition was lewd and that "mere nudity" was not enough, but primarily argued there was no evidence that the defendant was sexually aroused by the exhibition of the child. Addressing the defendant's specific argument, we concluded that there was sufficient evidence of the defendant's intent with respect to the dancing incident based on the description of his conduct in inducing the child to remove her clothes and dance with him, the nature of the dance (his genitals pressed against the child), and "his conduct and statements on the following day," which the court concluded "constitute additional evidence on which a rational factfinder could rely to draw an inference as to defendant's scienter." *Id*. at 445. That is, we followed the defendant's framing of the issue as a challenge to whether the state had proven that the defendant acted with the requisite intent—to stimulate the lust or sexual desires of the viewer. We did not, however, engage in a considered construction of the statute, having taken defendant's arguments on their own terms and we determined that the evidence was sufficient to support the finding that the defendant's conduct was for the purpose of his own sexual gratification.

One judge dissented. The dissent disagreed with the majority's framing of the key issue as whether the

defendant acted with the requisite intent, taking the position that ORS 163.670 "is focused on the objective nature of the children's conduct, not on the subjective intent of the person who induces the children to engage in the conduct." *Id.* at 447 (Armstrong, J., dissenting). The dissent acknowledged that there was sufficient evidence of the defendant's sexual purpose in inducing the child to dance naked with him, but concluded that that was insufficient to prove the crime because "there is no evidence from which a jury could find that defendant's or [the child's] genitals were exhibited to anyone in a lewd manner." *Id.* at 450. Cursorily responding to the dissent in a footnote, we stated that the

> "assertion that the statute's focus is not on the intent of the person charged under the statute is contrary to our holding in *Meyer*, 120 Or App at 326, in which we said: 'We interpret the phrase "lewd exhibition of the genitals or anus" in ORS 163.670 and ORS 163.673 to mean exhibition with the intent of stimulating the lust or sexual desires of the person who views it.'"

*Evans*, 128 Or App at 445 n 3. In so doing, we appear to have lost sight of the fact that, before reaching the analysis of a defendant's sexual purpose, *Meyer* had drawn the conclusion that a "lewd exhibition" was a term of common understanding that had an objective meaning—it connotes an exhibition that shows indulgence of lust, immorality relating to sexual impurity, and gross or wanton indecency with respect to sexual relations. 120 Or App at 325 n 8, 326 n 10.

Nonetheless, we invoked *Evans* subsequently in *Smith*, 261 Or App at 677. In *Smith*, the defendant argued (as had the defendant in *Evans*) that "mere nudity" did not constitute a "lewd exhibition," and that to the extent *Evans* held otherwise, it was wrongly decided. *Id.* at 667. In *Smith*, evidence supporting a charge of using a child in a display of sexually explicit conduct included that the defendant had pulled down the pants and underwear of a child, B, had her lie on her back, and then touched and photographed her vaginal area. *Id.* at 668-69. The defendant argued that the court should adopt the view of the dissent in *Evans* and conclude that the unrecovered photos that exposed B's vagina may have depicted "nudity alone," which would not be a lewd exhibition. *Id.* at 676. On those facts we declined to revisit

and overrule *Evans*, concluding that it was not "plainly wrong." *Id.* at 678. We went on to conclude that there was sufficient evidence to conclude that the photographs were a lewd exhibition because of the evidence allowing the inference that the defendant himself was sexually gratified by them. We did not address whether the photographs themselves were objectively lewd.

        To the extent that *Evans* (and, to the lesser extent, *Smith*) suggests the objective nature of the display at issue is not a necessary consideration to determine whether there has been a "lewd exhibition," we disavow those statements because they were based on a misreading of *Meyer* and are contrary to the plain meaning of the text of the statute, as informed by its context and legislative history.

        The remaining question is whether our decisions in *Evans* and *Smith*, by operation of the doctrine of *stare decisis*, preclude us from interpreting "lewd exhibition" in this manner. *Stare decisis* is a judicial doctrine motivated by "moral and intellectual, rather than arbitrary and inflexible" forces. *State v. Merrill*, 303 Or App 107, 119, 463 P3d 540 (2020), *adh'd to as modified on recons*, 309 Or App 68, 481 P3d 441, *rev den*, 368 Or 402 (2021) (quoting *Stranahan v. Fred Meyer, Inc.*, 331 Or 38, 54, 11 P3d 228 (2000)). And our adherence to *stare decisis* is presumptive, not absolute. *State v. Civil*, 283 Or App 395, 416, 388 P3d 1185 (2017). The doctrine holds the least force where a prior case did not, in fact, examine the issue at hand, as is the case here. *Id.* at 407.

        Here, the reality is we have never addressed the question at hand. As our retracing of our case law demonstrates, in rejecting a vagueness challenge to the phrase "lewd exhibition," *Meyer* drew from federal case law defining the same or similar phrases. It is evident, from the sources that we drew on, that *Meyer*'s standard was an objective one, based on the characteristics of the particular exhibition alleged to have been lewd. In *Evans* and *Smith*, we purported to apply that standard by echoing it, but instead, without analysis, we transmuted it into a new standard, holding that an exhibition of a child's sexual or other intimate parts meets the statutory definition so long as the

subjective purpose of the defendant allowing or creating the display is to elicit a sexual response from the defendant or someone else. In so doing, though, we gave the statute a meaning that is not communicated to the ordinary reader by its terms, and that risks generating the constitutional problems the Oregon legislature was intentionally trying to avoid by drafting the Oregon statutes to comport with *Miller* and *Ferber*. Under those circumstances, we decline to afford *Evans* and *Miller* the weight of *stare decisis*, to the extent they can be read to interpret "lewd exhibition" to include visual perception of a nude child without any other implication of explicit sex, simply because a defendant who observed the child's exposed sexual or other intimate parts in those contexts did so for the defendant's own sexual gratification.

## D.   *The Meaning of Lewd Exhibition*

For the foregoing reasons, the text, context, and legislative history demonstrate that "lewd exhibition" means the showing of a child's sexual or other intimate parts that is itself salacious or focused on sex. Further, because of the deep ties between child pornography on one side, and constitutional obscenity law on the other, whether something constitutes a lewd exhibition is determined by reference to objective standards. That is something that must be assessed through an examination of the characteristics of the exhibition as it would be perceived by a viewer of the display or recording, and not through an examination of the subjective intentions of the child, the intended viewer, or the person creating the display, if that person is someone other than the child or the viewer.

To assist factfinders and trial courts in making those objective determinations, we believe that a set of factors that have been widely analyzed and adopted by state[10]

---

[10]  *State v. Brock*, 248 Ariz 583, 591, 463 P3d 207, 215 (Ct App 2020), *rev den* (Dec 15, 2020); *Cummings v. State*, 353 Ark 618, 630 n 1, 110 SW3d 272, 279 n 1 (2003); *People v. Kongs*, 30 Cal App 4th 1741, 1754-55, 37 Cal Rptr 2d 327, 334-35 (1994), *as modified* (Jan 18, 1995), *rev den* (Apr 13, 1995); *People In Interest of T.B.*, 445 P3d 1049, 1059 (Colo 2019); *State v. Sawyer*, 335 Conn 29, 41, 225 A3d 668, 677 (2020); *State v. Brabson*, 7 So 3d 1119, 1125 (Fla Dist Ct App 2008); *People v. Lamborn*, 185 Ill 2d 585, 592, 708 NE2d 350, 354 (1999); *Purcell v. Commonwealth*, 149 SW3d 382, 392 (Ky 2004), *overruled on other grounds by Commonwealth v. Prater*, 324 SW3d 393 (Ky 2010); *State v. Roberts*, 2001-00154 p 9, 796 So 2d 779, 786-87 (La Ct App 10/3/01), *writ den*, 2001-2974 (La 9/20/02);

and federal[11] courts can be useful guideposts to assist fact-finders and trial courts in making those objective determinations. The factors are:

> "1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; 2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity; 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; 4) whether the child is fully or partially clothed, or nude; 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer."

*United States v. Dost*, 636 F Supp 828, 832 (SD Cal 1986), *aff'd sub nom United States v. Wiegand*, 812 F2d 1239 (9th Cir 1987), *and aff'd*, 813 F2d 1231 (9th Cir 1987).

We note that even courts that have explicitly adopted the *Dost* factors have raised valid concerns about their use. *See, e.g.*, *United States v. Amirault*, 173 F3d 28, 35 (1st Cir 1999); *United States v. Frabizio*, 459 F3d 80, 87 (1st Cir 2006) (*Dost* factors are not the equivalent of the

---

*Commonwealth v. Sullivan*, 82 Mass App Ct 293, 302-03, 972 NE2d 476, 484 (2012); *Hood v. State*, 17 So 3d 548, 555 (Miss 2009); *State v. Cerna*, 522 SW3d 373, 379 (Mo Ct App 2017); *State v. Saulsbury*, 243 Neb 227, 235, 498 NW2d 338, 344 (1993); *State v. Lopez*, 162 NH 153, 156, 27 A3d 713, 716 (2011); *State v. Myers*, 146 NM 128, 132, 207 P3d 1105, 1109 (2009); *People v. Horner*, 300 AD2d 841, 842-43, 752 NYS2d 147, 149 (2002); *State v. Reisner*, 253 A3d 1273, 1281-82 (RI 2021); *State v. Dubois*, 746 NW2d 197, 208-09 (SD 2008); *State v. Bolles*, 541 SW3d 128, 141 (Tex Crim App 2017); *State v. Morrison*, 31 P3d 547, 554-55 (Utah 2001); *Foster v. Commonwealth*, 0369-87-2, 1989 WL 641956 at *3 (Va Ct App Nov 21, 1989).

[11] *See, e.g.*, *United States v. Frabizio*, 459 F3d 80, 87 (1st Cir 2006) (noting adoption of *Dost* factors and describing their usefulness); *United States v. Spoor*, 904 F3d 141, 148-49 (2d Cir 2018) (analyzing video with *Dost* factors); *United States v. Larkin*, 629 F3d 177, 182 (3d Cir 2013) (acknowledging adoption of factors but noting they are "not dispositive and serve only as a guide"); *United States v. Steen*, 634 F3d 822, 826-27 (5th Cir 2011) (analyzing video with *Dost* factors, noting that "[a]ny determination of lasciviousness will have to be made based on the overall content of the visual depiction"); *United States v. Guy*, 708 Fed Appx 249, 262 (6th Cir 2017) (approving jury instructions based on *Dost* factors); *United States v. Lohse*, 797 F3d 515, 520-21 (8th Cir 2015) (acknowledging adoption of factors); *United States v. Perkins*, 850 F3d 1109, 1122 (9th Cir 2017) (same); *United States v. Wells*, 843 F3d 1251, 1254 (10th Cir 2016) (same); *United States v. Hunter*, 720 Fed Appx 991, 997-98 (11th Cir 2017) (analyzing photographs with *Dost* factors).

statutory term "lascivious"); *United States v. Rivera*, 546 F3d 245, 252-53 (2d Cir 2008) (recognizing "valid criticisms and cautions about the *Dost* factors but ultimately approving their use); *United States v. Villard*, 885 F2d 117, 125 (3d Cir 1989) (raising a concern over possible improper use of the sixth factor); *United States v. Price*, 775 F3d 828, 840 (7th Cir 2014) (holding that instructing the jury with *Dost* instructions was not plain error, but "discourag[ing] their routine use"); *State v. Sawyer*, 335 Conn 29, 41, 225 A3d 668, 677 (2020) (cautioning against applying the *Dost* factors "rigidly or mechanically").

However, the main concern is frequently not that the factors themselves incorrectly identify aspects of a depiction that make it a lewd exhibition.[12] Rather, the main concern is that the factors can be used improperly; that is, treated as a checklist or as additional necessary elements of the crime. We share that concern and do not intend that the *Dost* factors be used in those ways. The *Dost* factors are simply guideposts for a factfinder; a set of "neutral references and considerations to avoid decisions based on individual values or the revulsion potentially raised in a child pornography prosecution." *Rivera*, 546 F3d at 252-53. A factfinder does not have to find all of them before concluding that there was a lewd exhibition; conversely, the absence of one does not require an acquittal. Further, some of the factors may not be relevant or useful in any given case. What weight should be given to any specific factor will depend ultimately on the circumstances of the trial. In this, we are aligned with the majority of jurisdictions in the way they use the *Dost* factors. *See, e.g.*, *United States v. Horn*, 187 F3d 781, 789 (8th Cir 1999) ("It goes without saying that the *Dost* criteria are neither definitive nor exhaustive."); *United States v. Wolf*, 890 F2d 241, 245-47 (10th Cir 1989) ("All six factors need not be present in order to bring the depiction under

---

[12] *But see United States v. Hillie*, 39 F4th 674, 686-88 (DC Cir 2022) (determining that *Dost* was based on an erroneous reading of the legislative history, failed to honor the teachings of *Miller*, and required reasoning expressly rejected by *Williams*); *State v. Whited*, 506 SW3d 416, 419 (Tenn 2016) (rejecting *Dost* factors because "the fact-intensive determination of whether particular materials contain sexual activity or a lascivious exhibition of private body areas is not facilitated by the adoption of a one-size-fits-all 'multi-factor analysis' such as the *Dost* factors").

the proscription of the statute."); *State v. Lopez*, 162 NH 153, 156, 27 A3d 713, 716 (2011) ("Not all factors must be present to reach a determination that a visual depiction is a lewd exhibition of the genitals."); *State v. Myers*, 146 NM 128, 135, 207 P3d 1105, 1109 (2009) (holding that the *Dost* factors are "neither comprehensive nor necessarily applicable in every situation" and that the "inquiry will always be case-specific").

In sum, we agree with the majority of courts that the *Dost* factors are a useful tool for factfinders. These specific factors can apply neutrally across the wide range of charged cases and help to reduce decisions based on assumptions or unarticulated personal beliefs or biases. Although the factors may be most useful in cases that are close calls, the availability of a set of neutral factors will focus the inquiry on what is presented in the depiction itself—not the defendant's subjective state of mind—an evaluation that we have concluded is statutorily established and constitutionally required.

E.  *Application*

Returning to the facts of this case, we apply our modified definition of "lewd exhibition of sexual or other intimate parts." We have concluded, consistent with our statutory interpretation principles, that "lewd exhibition of sexual or other intimate parts" means "the showing of a child's sexual or other intimate parts that is itself salacious or focused on sex." 324 Or App at 733. As applied in this instance, because neither visual recording nor a live sex show are implicated, the focus must be on M's conduct in determining whether a lewd exhibition occurred.

The undisputed evidence for the display counts related to Counts 1 and 2 consisted of several, undifferentiated episodes when defendant would walk into M's bedroom, without knocking, and would encounter M in various states of nudity, including M's bare breasts, buttocks, and vagina. In response, M would sit on the bed, covered with a towel until defendant would leave the room. That evidence is insufficient as a matter of law to elevate M's nudity into something that is "itself salacious or focused on sex." *Id*.

Likewise, the evidence related to the display count and attempted display count (Counts 3 and 5) occurring at a second apartment unit lack the objective indicia of a lewd exhibition sufficient to elevate mere nudity into a lewd exhibition. The factual occurrences there presented similar, if not identical, conduct to those occurring in the first apartment.

The display count related to the shower occurrence (Count 4) presents a similar lack of objective indicia of any sexuality or focus on sex sufficient to elevate M's activity of taking a shower into a lewd exhibition of her sexual or other intimate parts. The evidence introduced for Count 4 included only that defendant partially opened the shower curtain while M was washing her hair, and defendant was thus able to focus upon M's breasts. That too falls short of any evidence that what was being viewed was, itself, salacious or focused on sexuality. Although the evidence amply supports the finding that defendant viewed M's unclothed body for the purpose of his own sexual gratification, that is not determinative of whether there has been a "lewd exhibition."

Judge Hellman's dissent suggests that the defendant's *viewing* of the minor's intimate parts is, itself, salacious or focused on sex, stating "[a] focus on a 15-year old's exposed breasts is inappropriate for her age and sexually suggestive." 324 Or App at 787 (Hellman, J., dissenting). But the problem with the dissent's approach, on both the bedroom and the shower incidents, is that it requires defendant's conduct to be considered part of the exhibition. If defendant had created a circumstance where *someone else* could view him ogling his minor daughter in a state of undress, wherein his conduct depicts a sexual interest in her intimate parts, that could indeed be an exhibition that was salacious and focused on sex, depending on the presentation. But the facts presented here do not allow for that finding. Defendant took no steps to allow for someone else to view him with his daughter in a state of undress, and so his activities are not part of the exhibition. In these instances, his role is solely as the intended viewer, and not a participant in a separate exhibition that he intended for anyone to view.

As no rational finder of fact could have concluded from that evidence that the state had proved, beyond a reasonable doubt, that M participated or engaged in "sexually explicit conduct," specifically a "lewd exhibition of sexual or other intimate parts," the trial court erred by denying the motion for judgment of acquittal for each display and attempted display count. The convictions for Counts 1 through 5 are thus reversed.

## III.   REMAINING ASSIGNMENTS OF ERROR

Turning then to the remaining assignments, due to our conclusion with respect to the assignments of error related to the convictions under ORS 163.670, we need not address defendant's assignments challenging the proportionality of the sentences arising from those counts.

Defendant makes two plain-error challenges to the trial court's decision to leave certain guilty verdicts unmerged in the judgment. First, defendant contends that third-degree sexual abuse (Count 9) should have been merged into first-degree sexual abuse (Count 7) in the judgment. Second, defendant contends that second-degree sexual abuse (Count 8) should have been merged into first-degree unlawful sexual penetration (Count 6). The state responds that any error is not plain and urges us to reject defendant's arguments for that reason. We conclude that, under *State v. Breshears*, 281 Or App 552, 383 P3d 345 (2016), the alleged errors are plain and, further, we exercise our discretion to correct them. To qualify for plain-error review, three requirements must be met: (1) it must be an error of law; (2) the point must be obvious, *i.e.*, not reasonably in dispute; and (3) the error cannot require us to go outside the record or select among competing inferences. *State v. Terry*, 333 Or 163, 180, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002). If those requirements are met, correcting a plain error is a matter of discretion. *Id.* at 180 n 11.

As defendant was charged, each of these crimes arose from the same episode, so our merger analysis is governed by ORS 161.067(1). ORS 161.067 provides, in relevant part:

"(1)   When the same conduct or criminal episode violates two or more statutory provisions and each provision

requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."

Challenges to the application of ORS 161.067 present a question of law. *Breshears*, 281 Or App at 554. Our courts have interpreted the statute to mean that "if one offense contains X elements, and another offense contains X + 1 elements, the former offense does not contain an element that is not also found in the latter offense. In that situation, under ORS 161.067(1), there is only one separately punishable offense." *State v. Blake*, 348 Or 95, 99, 228 P3d 560 (2010) (footnote omitted). A court must answer three questions when considering merger under ORS 161.067: "(1) Did defendant engage in acts that are 'the same conduct or criminal episode,' (2) did defendant's acts violate two or more 'statutory provisions,' and (3) does each statutory 'provision' require 'proof of an element that the others do not.'" *State v. Haddon*, 286 Or App 191, 194, 399 P3d 458 (2017). If the answer to all three is affirmative, merger is not required. *See id.* If, however, the answer to the first two factors is affirmative, but the answer to the third is negative, merger is required. *Id.* Tracking the wording of the statute, the analysis we apply focuses on the elements of the crimes alleged, not the particular facts that the state alleged to establish those elements. *Breshears*, 281 Or App at 558.

As charged in this case, Counts 7 and 9 both require proof of "sexual contact" and some manner of an absence of consent; first-degree sexual abuse, ORS 163.427(1)(a)(C) (2016), *amended by* Or Laws 2021, ch 82, § 7 (Count 7) that the victim was "incapable of consent" because of being "physically helpless" and third-degree sexual abuse, ORS 163.415 (Count 9) that the victim was "incapable of consent" because the victim was under 18 years of age. We have previously concluded that third-degree sexual abuse, under a "does not consent" theory is a lesser-included offense of first-degree sexual abuse under an "incapable of consent" theory. *See State v. Barnes*, 209 Or App 332, 338, 147 P3d 936 (2006), *rev den*, 342 Or 256 (2007). And as explained by the Oregon Supreme Court, "'does not consent' refers to the lack of capacity to consent due to age, as well as to the lack of actual consent." *State v. Ofodrinwa*, 353 Or 507, 530, 300 P3d

154 (2013). Given the equivalence of those different means of absence of consent, as alleged in this case, third-degree sexual abuse should have been merged into first-degree sexual abuse. As all three requirements for plain-error review are met, we conclude that entering separate convictions for Counts 7 and 9 was plain error and we exercise our discretion to correct it. *See State v. Pass*, 264 Or App 583, 590, 333 P3d 1139 (2014) (correcting plain error for failing to merge third-degree sodomy into second-degree sex abuse).

The foregoing discussion applies with equal force to defendant's assignment of error regarding entry of separate convictions for first-degree unlawful sexual penetration and second-degree sexual abuse, which likewise turns on the same question of consent. And likewise, we exercise our discretion to correct the plain error. *Id.* at 590.

Convictions on Counts 1 through 5 reversed; convictions on Counts 6 through 9 reversed and remanded with instruction to enter a judgment of conviction for one count of first-degree unlawful sexual penetration (Count 6) and one count of first-degree sexual abuse (Count 7); remanded for resentencing; otherwise affirmed.

**AOYAGI, J.,** concurring.

I agree with the majority that, when the legislature defined "sexually explicit conduct" for purposes of the crime of display, ORS 163.670, it intended a "[l]ewd exhibition of sexual or other intimate parts" (ORS 163.665(3)) to mean an exhibition of genitalia or other intimate parts in a manner that is objectively lewd. I also agree with both the majority and Judge Kamins that, in the circumstances here, our obligation to correctly construe the statute, coupled with recognition of our own role in muddying the waters around it, supports the approach taken by the majority.[1]

---

[1] Unlike Judge Kamins, I do believe that we could reverse the display convictions—thus giving effect to the legislative intent and the words of the statute—without having to overrule any existing precedent, by focusing on whether M engaged in an "exhibition," without getting into the meaning of "lewd." However, that analysis would be more strained, and it would ultimately be less helpful to the bench and bar than the majority's more fulsome approach. In my view, for the reasons expressed by Judge Kamins, we should not engage in a more strained and less helpful analysis solely to avoid overruling a prior decision because the defendant did not directly ask us to do so in his opening brief.

I therefore concur in the majority opinion in its entirety. I write separately because ORS 163.670 is a challenging statute from a construction standpoint, given how it is written, and our case law has both reflected and exacerbated that complexity. The majority opinion focuses on a very specific issue—the meaning of "lewd exhibition" as a form of "sexually explicit conduct." I write to make some broader observations, in the hopes that they may contribute to the ongoing effort to clarify the law on ORS 163.670.

## I.  PROPERLY CONSTRUING ORS 163.670 DOES NOT MINIMIZE DEFENDANT'S CONDUCT.

As a preliminary matter, it is worth stating out loud that defendant's efforts to see his daughter's naked body were wrong, and likely a criminal invasion of her privacy under ORS 163.700. To the extent that our case law regarding the crime of display has strayed at times from the legislative intent, it may be in part due to an understandable but nonetheless mistaken impulse to stretch ORS 163.670 in cases where the defendant engaged in voyeuristic acts and was charged only with display and not with invasion of privacy, particularly if the defendant seems especially blameworthy.

The crime of display is not meant to encompass every criminal act of a sexual nature committed against a child. ORS 163.670 was enacted to combat child pornography. At the time of its enactment, the legislature understood that "international trafficking in child pornography" was generating five to six billion dollars in revenues annually.[2] Display is a major felony sex crime and "the *most serious* of a group of related offenses that concern the visual recording and observation of children engaged in sexually explicit conduct that also include encouraging child sexual abuse, possession of materials, and failure to report child pornography." *State v. Carey-Martin*, 293 Or App 611, 630-31, 430 P3d 98 (2018) (internal citations omitted; emphasis added); *see also State v. Bates*, 304 Or App 732, 736, 472 P3d 768 (2020) ("The most serious of the child pornography crimes is ORS 163.670, which establishes the offense of using a child

---

[2] Testimony, Senate Committee on Judiciary, SB 375, Apr 25, 1985, Exhibit K (statement of Sen Tony Meeker).

in a display of sexually explicit conduct."); *State v. Porter*, 241 Or App 26, 34, 249 P3d 139, *rev den*, 350 Or 530 (2011) (among the offenses in ORS chapter 163, ORS 163.670 is "the most serious offense, which involves the actual creation of child pornography or the use of a child in a sexual display for a live audience").

ORS 163.670 is meant to criminalize a very particular type of conduct: creating child pornography in either a recorded or live format. Properly construing and applying ORS 163.670 does not minimize other types of sexual misconduct, which can and should be prosecuted under different statutes. We must resist the urge to extend the display statute beyond its intended scope to compensate for mischarging.

## II.   ORS 163.670 REQUIRES THE CHILD TO ENGAGE IN SEXUALLY EXPLICIT CONDUCT.

The majority's interpretation of "lewd exhibition" is consistent with an aspect of ORS 163.670 that is sometimes forgotten but that provides important insight into the legislative intent: The statute requires *the child* to participate or engage in sexually explicit conduct for someone to observe or record.

"A person commits the crime of using a child in a display of sexually explicit conduct if the person employs, authorizes, permits, compels or induces a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording." ORS 163.670(1). As written, the statute requires the child to participate or engage in sexually explicit conduct. If an adult employs, authorizes, permits, compels, or induces the child to do so, for any person to observe or record it, then the adult commits the crime of display. But the statute expressly requires that the child participate or engage in sexually explicit conduct. Of course, the child may not fully understand the nature of the conduct, particularly if the child is younger, but it is still the child, not the adult, who must engage in the sexually explicit conduct.

We made a misstep as to that aspect of the statute in *State v. Richardson*, 261 Or App 95, 102, 323 P3d 311,

*rev den*, 355 Or 880 (2014), when, in *dicta*, we analogized to a motorist hijacked by a bank robber to suggest that a child could participate or engage in sexually explicit conduct even if the child did "not actively exercise his or her volition to participate." We later corrected our footing, however, clarifying in *Bates*, 304 Or App at 746 n 7, that, although it is true as a general principle that a person can be forced to participate or engage in an event against their will, "the ultimate question regarding the child's actions under [ORS 163.670(1)] is whether the child 'participate[d] or engage[d] in sexually explicit conduct,' not whether the defendant engaged the child in the conduct." In *Bates*, the defendant had engaged in sexually explicit conduct, but the child had not, even if the child's presence served a subjectively sexual purpose for the defendant. *Id*. at 748 ("Even if, as the state contends, a factfinder could infer that defendant intended the child's presence to further his sexual purpose, that inference, alone, does not show that the child participated or engaged in the sexually explicit conduct.").

The majority's interpretation of "lewd exhibition" as requiring objective lewdness fits with the statutory requirement that the *child* has participated or engaged in sexually explicit conduct. An approach to "lewd exhibition" that depends solely on the defendant's subjective reaction to a child's conduct is inconsistent with the statute's focus on the child as the person participating or engaging in a lewd exhibition (or other sexually explicit conduct). At the same time, it is obvious that the legislature did not intend "lewdness" to turn on the child's subjective perception of their conduct, as that would seriously undermine the purposes of the display statute, especially as to younger children. The logical conclusion is that the legislature intended an objective standard.

In so recognizing, the majority appropriately focuses the initial inquiry on the child, requiring a determination whether the child participated or engaged in a lewd exhibition (or other sexually explicit conduct). If the child participated or engaged in an objectively lewd exhibition (or other sexually explicit conduct), then the next step is to determine whether the defendant employed, authorized, permitted,

compelled, or induced the child to do so, specifically for the defendant or someone else to observe or record.

In this case, M showered and dressed in her home with no intention of being seen. Defendant invaded her privacy when he intentionally walked in on her doing those things. But, using the normal meanings of words, it simply cannot be said that *M* herself participated in a lewd exhibition. To say that she did so requires an unnatural reading of ORS 163.670—one that strains the plain text, fails to give adequate consideration to context, and achieves a result that is inconsistent with the statutory purpose as reflected in the legislative history.

### III.   TODAY'S DECISION MAY HELP REDUCE OVERRELIANCE ON THE VERB "PERMITS."

A peripheral benefit of our recognizing that the crime of display occurs only when a child engages in an exhibition that is objectively lewd (or other sexually explicit conduct) is that it may help reduce prosecutorial overreliance on the statutory term "permits." ORS 163.670(1) applies when a person "employs, authorizes, permits, compels or induces" a child to participate or engage in sexually explicit conduct for any person to observe or record. One side effect of our mistaken focus on the defendant's state of mind has been an overemphasis on the verb "permits."

In *Porter*, 241 Or App at 28, the defendant lived with his wife, her 15-year-old daughter, and two male housemates. The wife and one housemate sexually abused the girl "in numerous ways," including "posing" her in "sexual positions" in common areas of the house. *Id.* The defendant was convicted of display on a "permits" theory, based on incidents in which he watched the girl being sexually abused and did not intervene. *Id.* On appeal, the defendant challenged the denial of his motion for judgment of acquittal, arguing that he could not "permit" the girl's conduct when he had no "legal relationship to her." *Id.* at 29. We disagreed. *Id.* Looking to the legislative intent, we indicated that "permits" needed to be construed broadly enough to reach "people who are instrumental in the production of live or recorded displays of sexually explicit conduct by children," such as "the photographers who record a

child engaging in sexually explicit conduct" and "persons who provide the equipment and the venue." *Id*. at 34-35. "[T]he legislature did not intend to limit liability to those with a legal relationship to the child; rather, we conclude that the legislature intended 'permit' to convey the broader meaning of 'to allow' or to 'make possible.'" *Id*. at 35; *see Webster's Third New Int'l Dictionary* 1683 (unabridged ed 2002) (defining "permit" to mean, variously, "to consent to expressly or formally" (as in allow or tolerate), "to give (a person) leave" (as in authorize), and "to make possible").

*Porter* refers to people who are instrumental in creating child pornography, and it involved a defendant who provided the venue where sexual abuse occurred in his presence. Our holding in *Porter* is consistent with the statute. However, when coupled with a mistakenly subjective view of "lewd exhibition," *Porter*'s description of "permit" as including "make possible" has contributed to confusion as to what the crime of display covers and has given rise to an increasing number of display cases framed around the verb "permits." In that vein, Judge Hellman's dissent posits that defendant "permitted" M to participate in a lewd exhibition, by opening M's door or moving the shower curtain so that he could see M naked against her will, thus instantly transforming M's innocent nudity into a lewd display by M that was "made possible" by defendant. 324 Or App at 786 (Hellman, J., dissenting); *see also* 324 Or App at 782 n 7) (Powers, J., dissenting) (arguing that "defendant's acts, including removing barriers to allow himself to look at the victim's sexual or intimate parts, made the victim's otherwise ordinary conduct into an exhibition and defendant's sexual intent made it lewd").

Properly construing "lewd exhibition" helps make clear that, when a minor's nudity or sexual activity is self-initiated, another person's unexpected observation or recording of it does not simultaneously *create* a lewd exhibition and *permit* the child to engage in it. *Cf. State v. Torres*, 319 Or App 513, 514, 511 P3d 85 (2022) (the defendant did not "permit" a child to engage in a lewd exhibition by secretly recording her while she was naked in her bedroom); *State v. Cazee*, 308 Or App 748, 762-63, 482 P3d 140 (2021) (the defendant did not "permit" teenaged girls to engage in sexually explicit conduct

by surreptitiously watching and visually recording them through their bedroom windows). Rather, to be guilty of display on a "permits" theory, a person must permit the actual conduct in which the child participates or engages, and that conduct must be objectively lewd or otherwise sexually explicit.

## IV.  THE MAJORITY'S CONSTRUCTION OF "LEWD EXHIBITION" AVOIDS CREATING AN UNINTENDED DISTINCTION BETWEEN OVERT AND SURREPTITIOUS VOYEURISTIC CRIMES.

Finally, another benefit of the majority's approach—which, as the legislature intended, focuses on whether the child's conduct was objectively lewd (or otherwise sexually explicit)—is that it eliminates the risk of creating an unintended, illogical distinction between overt and surreptitious voyeurism.

Under the dissent's approach to ORS 163.670, a sexually motivated adult who *overtly* observes or records an innocently naked child would be guilty of display, based on having "permitted" the child to engage in a "lewd display" through the very act of observing or recording the child. *See* 324 Or App at 785-86 (Hellman, J., dissenting). However, a sexually motivated adult who *surreptitiously* observes or records an innocently naked child would not be guilty of display, under existing precedent. *See Torres*, 319 Or App at 514 (using hidden cameras to secretly record a naked teenaged girl did not constitute display); *Cazee*, 308 Or App at 762-64 (observing and recording teenaged girls through their bedroom windows as they engaged in sexual activity did not constitute display).

There is no indication that the legislature intended *surreptitious* voyeurs to be guilty of invasion of personal privacy, a Class A misdemeanor (ORS 163.700) or Class C felony (ORS 163.701), but intended *overt* voyeurs to be guilty of display, a Class A felony (ORS 163.670). Such a distinction is not in line with the purposes of the display statute, nor does it make much sense. Both types of conduct are wrongful and criminal. Moreover, in practice, overtness is not a binary question—people who believe they are being surreptitious may nonetheless get caught in the act, including by victims,

and indeed anyone convicted of invasion of personal privacy was necessarily caught.

## V.   CONCLUSION

In sum, I agree with the majority that when the legislature defined "sexually explicit conduct" for purposes of the crime of display, ORS 163.670, it intended a "[l]ewd exhibition of sexual or other intimate parts" (ORS 163.665(3)(f)) to mean an exhibition of genitalia or other intimate parts in a manner that is objectively lewd. M did not participate or engage in a lewd exhibition. It follows that defendant's conduct, although criminal, did not constitute the crime of display.

Accordingly, I concur.

Pagán, J., joins in this concurrence.

**KAMINS, J.,** concurring.

Opening briefs carry no magic powers. They are not statutes that require maxims of construction or Supreme Court cases whose holdings are subject to vigorous debate. They are simply a lawyer's conception of a client's best arguments at a moment in time. In an adversarial system, there is value to the arguments selected by lawyers at the outset of an appeal. That value, however, is not absolute.

I agree fully with the majority's analysis and conclusion. I also agree with Judge Hellman's articulation of the applicable legal standard and recognition of the need to revisit our case law. I write only to respond to Judge Powers's view that these circumstances do not justify overruling our prior case law because defendant did not make that request in his initial filing before this court. According to Judge Powers's dissent, we, as an en banc court in the face of unconstitutional precedent and in receipt of additional briefing from the parties, are beholden to and constrained by the content of the parties' original briefs. Our duty to shepherd the law cannot be delegated so absolutely.

It is important to understand *why* opening briefs matter. American courts function in an adversarial system based on the "party presentation principle"—that is, "we rely

on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, ___ US ___, 140 S Ct 1575, 1579, 206 L Ed 2d 866 (2020) (citation and internal quotation marks omitted). Essentially, opening briefs present a travel itinerary for courts to follow. Those maps keep judges in check, preventing us from taking intriguing detours "looking for wrongs to right." *Id*. (citation omitted). However, the "party presentation principle is supple, not ironclad[,]" and there are "no doubt circumstances in which a modest initiating role for a court is appropriate." *Id*.

Indeed, far from "forging *** new ground," as the dissent asserts, we routinely recognize as much when construing statutes. 324 Or App at 776 (Powers, J., dissenting). When a party's roadmap fails to provide a necessary connecting route, we have acknowledged that gap and added that route to the itinerary. *See, e.g.*, *State v. A. B. K.*, 323 Or App 246, 248, 522 P3d 894 (2022) (engaging in statutory construction to determine whether autism spectrum disorder qualifies as a "mental disorder" within the meaning of ORS 426.005(1)(f) despite the fact that neither party argued the point (citing *Strasser v. State of Oregon*, 368 Or 238, 260, 489 P3d 1025 (2021) (explaining that an appellate court has an independent duty to correctly interpret any statute that comes before it, "regardless of the arguments and interpretations offered by the parties"); *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) (observing that an appellate court is responsible for identifying the correct interpretation of a statute, "whether or not asserted by the parties"))).

In this case, defendant argued to the trial court that, if our case law interpreted "lewd exhibition" to include this conduct, that case law should be overruled.[1] The state responded to that argument and the trial court considered and rejected it. When preparing the opening brief, defendant's appellate counsel chose to focus on arguments with the greatest chance of success—that is, arguments that

---

[1] After closing argument, the trial court joined the chorus of voices questioning the validity of our case law. ("If I was left to read the statute myself, I don't know that I would decide that it was applicable to Mr. Parra-Sanchez's conduct. But the Court of Appeals has made it clear that they read it differently than me. I'm following their lead.")

did not include persuading a panel to overrule the court's precedent, a standard that the dissent recognizes is exceedingly high. *See State v. Civil*, 283 Or App 395, 417, 388 P3d 1185 (2017) (holding that a court should only overturn precedent that is "plainly wrong"—"a rigorous standard, satisfied only in exceptional circumstances"). That is exactly what we encourage appellate attorneys to do. *See, e.g.*, *In re Sanai*, 360 Or 497, 533, 383 P3d 821 (2016) ("As the Court has recognized on numerous occasions, the process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy." (Internal punctuation omitted.)). And perhaps, that is why we have disavowed precedent without being asked by the parties when it is necessary to perform our duty. *See, e.g.*, *State v. Prophet*, 318 Or App 330, 342, 507 P3d 735, *rev den*, 370 Or 472 (2022) (*sua sponte* overruling prior Court of Appeals cases that the court interpreted to be inconsistent with subsequent Oregon Supreme Court precedent); *Kleikamp v. Board of Commissioners of Yamhill County*, 301 Or App 275, 286, 455 P3d 546 (2019) (disavowing the analysis in prior cases upon which the appellant relied without discussing whether a party requested as much); *see also State v. White*, 346 Or 275, 292, 211 P3d 248 (2009) (Kistler, J., concurring) (observing that "focusing solely on what our past decisions have said about a statute can sometimes cause us to lose sight of the statutory text that underlies those decisions, and it is occasionally helpful to return to the text, context, and history of a statute to determine whether our decisions have drifted away from the legislature's intent").

	Long after defendant filed his opening brief, we, as an en banc court, concluded that we could not travel the map provided without confronting the constitutionally suspect yet currently binding holdings of our prior case law. Accordingly, we sought briefing from the parties (the adversaries), thus preserving their role in an adversarial system.[2] That practice is routine in federal court, where en banc proceedings are reserved for issues of "exceptional importance," such as overruling precedent. FRAP 35(a)(2).

_____

[2] In that briefing, neither adversary defended our problematic case law.

In those limited circumstances, parties are invited to weigh in anew on those questions. *See, e.g.*, *United States v. Campbell*, 26 F 4th 860, 871 (11th Cir), *cert den*, ___ US ___, 143 S Ct 95 (2022) (recognizing that parties may make new arguments concerning the issues they are directed to brief in en banc briefing notice). Far from "destabilizing" as Judge Powers's dissent contends, that process—employed by all federal courts of appeals—provides an avenue for a court to revisit its precedent informed by input from the adversaries. 324 Or App at 778 (Powers, J., dissenting).

Although I agree with Judge Powers that the adversarial process functions best when a court is faithful to the precise route provided by the parties, that prudential preference must bend here. The issue is preserved, the adversaries weighed in, and we have an obligation to correctly construe the statute. The rationale behind the party presentation principle is met. The alternative, that we—as an en banc court having determined that our own case law violates the constitutional rights of Oregonians—simply look the other way, is not prudence, but an abdication of our duty. Relying on unconstitutional case law to reach an unconstitutional result because an attorney did not invoke the right incantation at the right time is not judicial restraint, but a transfer of power from the judiciary to the lawyers.[3]

I concur.

Lagesen, C. J., and Pagán, J., join in this concurrence.

**JAMES, J. pro tempore,** concurring.

I begin by stating that I wholeheartedly join in Judge Kamins's excellent concurrence. As to the majority, I agree that "lewd exhibition," as part of the definition of "sexually explicit conduct" found in ORS 163.665(3), must involve an objective component. I further agree that, to the extent our previous decisions have held otherwise, they must be disavowed. As such, I join the majority in reaching

---

[3] *See* Amanda Frost, *The Limits of Advocacy*, 59 Duke L J 447, 486 (2009) ("[C]ourts certainly have the power, if not the obligation, to raise a constitutional infirmity overlooked or ignored by the parties. In short, the fact that courts cannot set their agenda does not mean that litigants can co-opt them into applying unconstitutional laws to achieve unconstitutional purposes.").

its result. I depart, however, in two respects. First, I do not join the majority in advocating for the use of the *Dost* factors, for the reasons set forth below. Second, I write separately to emphasize a point not discussed by the majority, but one that has been the focus of a fair amount of the parties' arguments, and one that is particularly important to my conclusion that principles of *stare decisis* must yield in this instance.

## I.  *DOST* FACTORS

In legal analysis, few things are as pernicious as judicially created factor tests. The difficult questions in the law are usually highly circumstance dependent. Context drives focus, and what may determine one case, might not determine another. And to this contextual background, the lawyers and the court apply human reason and persuasion. This, too, is contextual. One might approach the same issue, in two cases, in slightly differing ways because the factual differences between the cases called for a shift in focus; and each approach, though different, can be reasonable. Similarly, different people might think of a complex issue in slightly different ways, each valid. One power of diversity in the legal profession is the recognition that diverse perspectives, and diverse approaches to a problem, are an *asset*, not a flaw to be mitigated.

Factor tests take the depth and complexity of human thought and perspective and replace it with a checkbox form. Although often couched in language of "non-exhaustive factors," or "guideposts," factor tests naturally encourage parties to follow a script: consider A, then consider B, finally consider C, then decide. Parties, wanting to preserve their issue, will naturally follow the script, even though it purports to only be a guide. And courts, not wanting to err, will more often than not hew to the script, lest they be accused of overlooking a factor.

When a court announces a factor test, we see litigation shift. Rather than grapple with the primary issue, we see parties, and appellate courts, resolving discrete issues with one of the factors. What was meant by a word choice in factor A? What is the scope of factor B? These opinions start to dominate the discourse, and soon the complex issue that

spawned the factor test is lost to time, replaced only with a jurisprudence of the test itself. The forest is gone; only trees remain.

Courts have echoed my concerns about factor tests generally in the context of the *Dost* factors. As the Supreme Court of Tennessee noted,

> "Courts that have approved application of the *Dost* factors, even with the typical disclaimers that they are useful but non-exclusive, have at times ended up engaged in an extended discussion of each *Dost* factor, even those that were not applicable, and have become bogged down in disputes over what a given *Dost* factor means and how to apply it."

*State v. Whited*, 506 SW3d 416, 434 (Tenn 2016).

Rather than creating predictability, the disputes around the *Dost* factors have resulted in fractured courts and split circuits on issues from how many factors constitute a threshold, to what the factors themselves mean. *See, e.g.*, *United States v. Wolf*, 890 F2d 241, 245 & n 6 (10th Cir 1989) ("We do not hold that more than one *Dost* factor must be present * * *."); *United States v. Villard*, 885 F2d 117, 122 (3d Cir 1989) ("Although more than one factor must be present in order to establish 'lasciviousness,' all six factors need not be present."); *Whited*, 506 SW3d at 434 ("The sixth *Dost* factor, whether the depiction is intended to elicit a sexual response in the viewer, has been the subject of significant controversy. Indeed, courts are sharply split on how the sixth *Dost* factor should be applied." (Footnote omitted.)). As at least one commentator has noted, "the *Dost* test has produced a profoundly incoherent body of case law." Amy Adler, *Inverting the First Amendment*, 149 U Pa L Rev 921, 953 (2001).

For many courts, litigating *Dost* has eclipsed the statute at issue. Accordingly, the Seventh Circuit has advised lower courts not to rely on *Dost*: "We take this opportunity * * * to discourage the use of the *Dost* factors; they are unnecessary in light of the clear statutory definition of the term 'sexually explicit conduct.'" *United States v. Price*, 775 F3d 828, 831 (7th Cir 2014). So, too, the Tennessee Supreme Court held that the *Dost* factors risk inappropriately supplanting the essential task at hand: statutory

interpretation. "[M]any seem inexorably drawn to using *Dost* as a lasciviousness definition or a test of sorts, with lengthy analysis and weighing of each 'factor' and debate regarding different courts' interpretation of specific factors. This often ends up pulling them 'far afield' from the task at hand, namely, applying the statutory language to the materials at issue." *Whited*, 506 SW3d at 437.

For these reasons, I do not join the majority in its favorable treatment of the *Dost* factors. However, because those factors are not essential to the majority's result, I join the rest of the majority analysis without reservation. The remainder of my writing is to emphasize a point the majority did not address, but one critical for me. As I will explain, on the issue this case presented—offenders acting to view others in states of undress, in locations where there is a reasonable expectation of privacy, for their own sexual gratification—the legislature has repeatedly criminalized that conduct in the context of ORS 163.700, the invasion of privacy statute. I begin by setting out the history of ORS 163.700, after which I will turn to how we are to utilize that history in the question before us, which involves application of a different statute, ORS 163.670.

## II.   ORS 163.700

ORS 163.700 criminalizes the invasion of personal privacy. In its current form, it reads:

"(1)   Except as provided in ORS 163.702, a person commits the crime of invasion of personal privacy in the second degree if:

"(a)(A)   For the purpose of arousing or gratifying the sexual desire of the person, the person is in a location to observe another person in a state of nudity without the consent of the other person; and

"(B)   The other person is in a place and circumstances where the person has a reasonable expectation of personal privacy; or

"(b)(A)   The person knowingly makes or records a photograph, motion picture, videotape, or other visual recording of another person's intimate area without the consent of the other person; and

"(B)   The person being recorded has a reasonable expectation of privacy concerning the intimate area.

"(2)   As used in this section and ORS 163.701:

"(a)   'Intimate area' means nudity, or undergarments that are being worn by a person and are covered by clothing.

"(b)   'Makes or records a photograph, motion picture, videotape or other visual recording' includes, but is not limited to:

"(A)   Making or recording or employing, authorizing, permitting, compelling or inducing another person to make or record a photograph, motion picture, videotape or other visual recording.

"(B)   Making or recording a photograph, motion picture, videotape or other visual recording through the use of an unmanned aircraft system as defined in ORS 837.300, even if the unmanned aircraft system is operated for commercial purposes in compliance with authorization granted by the Federal Aviation Administration.

"(c)   'Nudity' means any part of the uncovered or less than opaquely covered:

"(A)   Genitals;

"(B)   Pubic area; or

"(C)   Female breast below a point immediately above the top of the areola.

"(d)   'Places and circumstances where the person has a reasonable expectation of personal privacy' includes, but is not limited to, a bathroom, dressing room, locker room that includes an enclosed area for dressing or showering, tanning booth and any area where a person undresses in an enclosed space that is not open to public view.

"(e)   'Public view' means that an area can be readily seen and that a person within the area can be distinguished by normal unaided vision when viewed from a public place as defined in ORS 161.015.

"(f)   'Reasonable expectation of privacy concerning the intimate area' means that the person intended to protect the intimate area from being seen and has not exposed the intimate area to public view.

> "(3)  Invasion of personal privacy in the second degree is a Class A misdemeanor."

ORS 163.700 (2021).

The legislature first enacted ORS 163.700 in 1997. Or Laws 1997, ch 697, § 1; SB 1076 (1997), following the "Savage Tan" scandal. There, the owner of a tanning salon had surreptitiously videotaped customers undressing. Tape Recording, Senate Committee on Crime and Corrections, SB 1076, Apr 23, 1997, Tape 84, Side B (statement of Jeff Merrick). Testimony before the legislature included Multnomah County District Attorney First Assistant John Bradley's comments, who reported that his office could not pursue criminal charges against the tanning salon owner because no crime had occurred. *Id.* (statement of John Bradley).

Diana Godwin, an attorney representing the victims who also coauthored the bill, remarked on the bill's ambitions:

> "[We represent] 10 or 12 women who were victimized in the Savage Tan case last year. As you heard from John Bradley, Assistant District Attorney of Multnomah County, when the District Attorney's Office looked into this issue they found there was no crime on the books under which these people could be prosecuted. \*\*\* I've drafted this bill working with Senator Stull's office and working with other interested parties. As your counsel said, the bill makes it a misdemeanor punishable by one year in jail for a person knowingly to make or record a photograph, motion picture, videotape, or other visual recording of another person in a state of nudity. \*\*\* And at the time the visual recording is made the person being recorded is in a place and circumstances where the person has a reasonable expectation of privacy. \*\*\* And we have defined the circumstances where someone does have a reasonable expectation of personal privacy, which includes but is not limited to—because there are always cases where we have not thought of something—a bathroom, dressing room, locker room, tanning booth, or any other place where a person undresses in an enclosed space that is not open to public view."

Tape Recording, Senate Committee on Crime and Corrections, SB 1076, Apr 28, 1997, Tape 87, Side A (statement of Diana Godwin).

In further committee discussions, Legislative Counsel Nikola Jones emphasized the need for the amendments to encompass *partial* nudity and envisioned a scenario where,

> "[t]hinking from a prosecutor's point of view, when trying to charge someone who is photographing people who are in a restroom there is an argument that can be made that your genitals are exposed at one point or another when you're about to go to the bathroom or going to the bathroom or just finished and robing again. So, there is an argument that can be made ***. A person filming a person going to the bathroom can be covered the way it is written, especially if we make it clear in the legislative history ***. But I don't think there's anything wrong with making it explicitly clear."

Tape Recording, Committee on Crime and Corrections, SB 1076, May 7, 1997, Tape 104, Side A (statement of Nikola Jones).

The 1997 statute only prohibited the film or photographic recording of a person described under the circumstances set out in the law and not the in-person observation of someone. The 2001 amendments to invasion of privacy expanded the proscribed conduct to include in-person observation:

> "(1) [A] person commits the crime of invasion of personal privacy if: *** [f]or the purpose of arousing or gratifying the sexual desire of the person, the person is in a location to observe another person in a state of nudity without the consent of the other person; and *** [t]he other person is in a place and circumstances where the person has a reasonable expectation of personal privacy."

Or Laws 2001, ch 330, § 1.

Senator Lenn Hannon sponsored Senate Bill 625, whose legislative aide outlined the purpose of the amendments:

> "Senate Bill 625 was drafted *** to fill in a legal loophole having to do with person's privacy ***. ORS 163.700 speaks to the crime of the person who knowingly records another person in a partial state of nudity without that person's consent, but if that same person uses a recording

device like a camera to zoom in and out simply to observe but doesn't record and they're doing it for the same purpose, for sexual gratification, the statutes are silent. SB 625 would make it a class A misdemeanor just like it would if you were recording or taking photographs or video camera. *** The reason I see no difference personally whether you actually catch that individual on tape, still photo, video camera, whether you're looking through a peephole, using some kind of magnifying glass, you're still there for one reason only—sexual gratification—whether it is taped or not taped. The new statute if passed would place observation in the same category. This doesn't pertain to the open shower area of something like at the YMCA with people walking back and forth and observing many different states of nudity. This is clearly for people who are being observed in a closed area and who have a reasonable expectation of privacy like a bathroom, a dressing room, a tanning booth. Any area where you shut the door and are sure that it is a private personal area and not open to people viewing you. Other statutes speak to public indecency and private indecency as a crime. Whether a person exposes him or herself to another person. But the statutes are silent to this particular issue."

Tape Recording, Senate Committee on Judiciary, SB 625, Mar 6, 2001, Tape 53, Side A (statement of Dixie Hannon).

The Judiciary Committee discussed circumstances in which a person might incidentally observe another person nude within an enclosed space such as a communal shower at the gym. *Id*. (comments of Chairperson Sen John Minnis). It emphasized the requirement that the observation be for the purposes of sexual gratification to address that problematic scenario. In response, Ingrid Swenson of the Oregon Criminal Defense Lawyers Association commented:

"The original statute does not require an intent to arouse; it's simply the recording in a private place of a person's nudity. So, this would be a significant change of direction because it does require the intent to gratify or arouse, and I think that is a good limitation to make this behavior criminal. And simply requires the knowing observation. I think I know what it's probably directed at: someone with intent observes a person for the purpose of gratification. *** It's probably not directed at people who more or less inadvertently observe nudity. Unfortunately, I think the

bill could be applied to those people. And there a couple of categories of people that you might think about. Spouses, for example, or people engaged in intimate relationships. These people ought to be excluded. *** You don't want to make it criminal for one to observe the other. *** When one spouse might have thought there was consent to this type of observation and because the other spouse is angry says they want him prosecuted. *** If there's a teenager who is in his own apartment and has a neighbor and maybe the curtains are closed and the wind blows them open and here is a teenage boy looking at this vision of a nude person, he might be sexually aroused and he might not go away, but he has not created the circumstance, it sort of created itself. One way to exclude that kind of circumstance is to say the person had to knowingly place themselves in a position to observe. *** This is a suggested limitation. *** I would add 'places oneself in a position to observe and does observe.'"

Tape Recording, Senate Committee on Judiciary, SB 625, Mar 6, 2001, Tape 54, Side A (statement of Ingrid Swenson).

On the floor of the Senate, one senator recounted her own experience with a voyeur who intruded into the enclosed space of her home, violating her privacy:

"I guess for the first time in my adult life I have to say something that is both personal and private. You might think this is a simple bill; it is not a simple bill. As a young woman growing up, my fears have lasted with me until this day. Because growing up in Louisiana, we used to have peeping toms who on several different occasions would break into the windows of women. And I was such a victim. And today it is hard for me to stay in my home alone or any place else. So, I want you to know this is a very, very important bill. And if you've never been the victim of this kind of activity, you don't know what it is. It's personally violating and personally very frightening and it can last you for a lifetime. Today is the first day this had been triggered for me and the first day I have ever spoken out about it. And for this woman in Ashland, I join her in this cause and in this fight. And to let you know how psychologically unsettling this can be. I urge your support."

Tape Recording, Senate Floor Session, Apr 3, 2001, at 1:24:46 (comments of Sen Margaret L. Carter).

When the bill reached the floor of the House, Representative Carl Wilson reiterated the understanding that the amended statute would provide broad coverage for instances where an offender had breached a barrier to observe the victim in an enclosed space with the intention of gratifying his or her sexual desire:

> "A very simple bill but a good bill. Back in 1997 the legislature passed a bill that created the crime of invasion of personal privacy, and that bill was brought about due to the fact that owners of tanning bed establishments and so forth were drilling holes in those tanning booths to film people who had an expectation of privacy. This bill takes care of a loophole in that law; this will allow you to charge someone with invasion of personal privacy whether or not they are videotaping—if they are there just looking."

Tape Recording, House Floor Session, SB 625, May 21, 2001, Tape 136, Sides A and B (comments of Rep Carl Wilson).

The legislature revisited invasion of privacy again in 2009 in order to ensure the protection of children, who had been excluded in the 1997 statute. Or Laws 2009, ch 877, § 1. Our decision in *State v. Mayes*, 220 Or App 385, 186 P3d 293 (2008), prompted the changes, where we determined that the definition of nudity set out in ORS 163.700(2)(b) applied only to post-pubescent people. *Id.* at 387. In *Mayes*, the defendant "arranged to have small cameras concealed in restrooms in his workplace and in a doctor's office that had hired defendant's business to install telecommunications equipment." *Id.* The defendant captured a number of adult women and two young girls—aged nine and seven—using the restrooms. *Id.* After examining the relevant legislative history and the language of the statute in context, we concluded that that victim had to be post-pubescent to be covered by the then-existing statute.

The *Mayes* case figured prominently in the discussions of the 2009 amendments, especially the legislative imperative for the invasion of privacy statute to protect children. Wasco County District Attorney Eric Nisley recounted his experience trying the *Mayes* case:

> "One of the most important parts of this bill in my estimation is changing the definition of what nudity means.

Defense counsel brought this up in the trial of Ronnie Mayes. I have provided a printout from the *Oregonian*. As far as I know this is the only case of this kind that has gone fully to a jury trial. I tried it myself. It was a Class A misdemeanor. He was convicted of six counts. Two of the counts involved two very young girls who were filmed going to the bathroom. The camera was small—it was placed in a garbage can inside a toilet paper roll. The camera itself was smaller than the penny I'm holding. What happened there was even though you could clearly see the genitals of the two girls on the computer that Mr. Mayes had, the Court of Appeals found that because we were not addressing post-pubescent genitalia only and those convictions were over-turned. We're urging the state and committee to change that—to make the filming of any genitalia or the other parts described there [they're?] criminal in this sense. The other aspect that has changed is making this a Class C fel-ony and making it a sex offense. It's hard for me to under-stand any argument why you would secretly film someone defecating or urinating and where this wouldn't have a sex-ual intent. [Mayes] has a gross amount of pornography in his business, one of the locations where he filmed, including pornography of *** potty cams *** this is something that sexually excited him. He was very aroused by this type of activity ***. This person is not a sex offender even though he has been convicted of this. It's difficult to imagine a sce-nario where someone would want to view that ***. This is a huge community impact, especially in smaller communi-ties like the Dalles where I am from. He filmed in three or four different locations—one of which was a doctor's office ***. I think I had calls for three days."

Audio Recording, House Committee on Judiciary, HB 2477, Feb 24, 2009, at 1:26:00 (statement of Eric Nisley).

Nisley recounted other experiences to the committee to emphasize the difficulty in seeking convictions for inva-sion of privacy:

"We had a guy that owned a restaurant in the Dalles who set up a little storeroom adjacent to the women's, his employees' bathroom, and he was able to stand on boxes and watch as his employees used the restroom. I don't par-ticularly think that sounds very interesting. He did. We didn't have enough evidence to prove that case. We knew he did it. He was caught in the room, and there was the hole

there. The reason I bring that up is it's unusual to bring that case to court."

*Id.* at 1:31:49.

The committee also heard testimony from the parent of one of Mayes's underage victims, who was filmed wiping her bottom:

"It has been years but still gets to me. So, at one time we thought we had him. A year ago, we found out we didn't. It was hard. I was brought in to identify the victims because I was the employee of Ronnie Mayes. *** One of the first shots was my daughter. And when you imagine videotaping somebody and how we explained to our daughters at that time that she was videotaped, they imagine running through fields with flowers in their hands. But what we saw was their bottoms—them wiping themselves. And it's because of the technology this man was able to do it. And our law needs to update to the technology we have. Last October we found out that because my children had not reached puberty, the charges were dropped against him. *** We need to protect the children, and this is excluding children because of one word."

*Id.* at 1:33:33 (statement of Jean Beckley).

The Judiciary Committee's discussions centered on a circumstance that some members referred to as the "bathtub scenario" in which a family member would be criminally liable if he or she innocently photographed a nude child taking a bath. Vice-Chair Representative Judy Stiegler described the concern and proposed a solution for addressing it:

"With respect to the baby in the bathtub types of scenarios, I had in-depth discussion with legislative counsel on this, Josh Nasby, and what we ultimately decided is that it's going to be very difficult to try to put a box around this, so what we ended up doing was probably the only thing under the circumstances we could do, which was put a laundry list of people excluded for taking these type of pictures. You'll see the long list that it's been expanded from mother and father and siblings and grandparents and uncles and first cousins by blood, adoption, or marriage. Notice there is an 'and' there. *** These pictures need to be taken for the purpose of arousing or gratifying a sexual desire. Be

sure and read that in the conjunctive. It's not an 'or.' These pictures are taken by one of these people and done for one of these types of purposes."

Audio Recording, House Committee on Judiciary, HB 2477, Apr 23, 2009, at 00:3:07 (comments of Rep Judy Stiegler).

Ultimately, the legislature resolved that particular family members would be exempt from ORS 163.700(1)(a) (2009) provided that a recording was not made for the purposes of sexual gratification. ORS 163.702(2)(a), (b) (2009).

At the Joint Subcommittee on Public Safety, after concerns were expressed about the fiscal impact of elevating the crime to a felony and requiring sex-offender registration, Representative Stiegler reiterated that the bill's primary intention was to ensure the protection of pre-pubescent children:

"We're not talking about family pictures or naked babies in the bathtub. *** We are talking about taking pictures meant to arouse or gratify sexual desire. *** We are recommending to remove the enhancement to a C felony. *** We're talking about the potty cams and those types of things. It's the pictures of pre-pubescent children that are not being protected. *** The primary situation is Rep. Huffman's intention to address pre-pubescent children being protected. *** That's the crux of what we feel is important."

Audio Recording, Joint Committee on Public Safety, HB 2477, May 13, 2009, at 00:52:25 (comments of Rep Judy Stiegler).

In 2015, the legislature was yet again faced with the problem of invasive, harmful conduct that fell outside of the invasion of privacy statute's ambit. A voyeuristic practice called "upskirting" left police frustrated that they could not pursue a criminal investigation because Oregon's law did not forbid the conduct. In one instance, the *Oregonian* reported that "a man crouched down in a Target aisle and snapped photos up a 13-year-old girl's skirt." Emily E. Smith, *Taking Photos Up Girl's Skirt at Beaverton Target: Appalling, But Not a Crime, Judge Rules*, Oregonian (Feb 5, 2015), https://www.oregonlive.com/beaverton/2015/02/taking_photos_up_girls_skirt_a.html. The paper reported that the girl "didn't

notice him stick his cellphone under her skirt, but some-one else did." *Id.* The defendant in that case was acquitted on two counts of invasion of privacy, among other charges, because the Washington County Circuit Court determined that the conduct fell outside of the conduct that the statute proscribed because it occurred in a public place and under-garments covered the child's genitalia. *Id.*; *State v. Patrick Joseph Buono*, Case No. C140453CR.

The legislature amended ORS 163.700 to include recording the "intimate area" of a person, which means "nudity, or undergarments that are being worn by a per-son and covered by clothing." Or Law 2015, ch 321, § 1. Representative Peter Buckley, the bill's cosponsor, reported to the committee that a teacher in Albany whose student had secretly captured a photograph of the undergarments under her skirt while she was teaching in the classroom prompted legislation. Audio Recording, House Committee on Judiciary, HB 2596 and HB 2356, Feb 18, 2015, at 00:02:09 (comments of Rep Peter Buckley).

In addition to expanding invasion of privacy to prohibit photographing an intimate area such as under a person's garments in public, the committee also heard testi-mony about a companion bill, HB 2356, to elevate invasion of privacy to a felony under certain circumstances. Or Laws 2015, ch 645, § 2. Denyc Boles, a former representative, described the intentions behind creating invasion of pri-vacy in the first degree, which a stepfather prompted, who had been secretly recording his stepdaughter, among other women:

> "[The stepfather] left a hidden camera in the bathrooms and bedrooms of these women and stored the images on the thumb drive. He is spending nearly four years in prison, but not because of the images in the videotaping but because of the three counts of burglary. There were 14 counts of invasion of privacy—just for Ashley. There are other recent cases in Happy Valley and Beaverton. *** Currently, this is a misdemeanor regardless of the age of the victim. *** I introduce this bill in order to move Oregon's laws forward to keep up with the rapidly developing technology. *** People that intentionally place hidden cameras in bedrooms and bathrooms and who capture those images forever should be

charged appropriately. \*\*\* House Bill 2356 would make the invasion of privacy a Class C felony \*\*\* this crime needs to be reclassified; the predatory nature, the sexual distinctions, the potential image longevity should be reflected in its classification. \*\*\* With increasing technology, Oregon's current statute is inadequate for this crime. The images have the potential to be in cyberspace forever. The victim's privacy was not simply compromised in a place where they should feel the safest, their bedroom and bathroom, but continues to be compromised in the future."

*Id.* at 4:38 (statement of Denyc Boles).

The victim also testified that her stepfather had assisted her in filing police reports for stalking that was occurring over the internet; she later discovered that he was the stalker after viewing several videos from hidden cameras in her home that "were placed in our bedrooms and bathrooms without us victims knowing." *Id.* at 8:41 (statement of Ashley Buckle).

Another witness described how her underage daughter, who also testified before the committee, had been secretly recorded over the course of four years while she undressed and showered during stays at a family friend's beach house:

"He bought a small recording device the size of a car fob to secretly tape her as she dressed from showering. He continued to do this ritual over the course of four years. \*\*\* Then, he decided to record her in her bedroom here in Portland—a place where you would expect complete privacy. Luckily, the camera was discovered after a few months of recording and ultimately this is what led to his arrest, but the ways our laws are currently written would have given him a slap on the wrist. \*\*\* It was only because he was gutsy enough to place a camera in our own home, he was charged with two counts of burglary. \*\*\* He entered our house with the intent to commit a crime. \*\*\* To add insult to injury he not only doesn't have to register as a sex offender, but when he is released from prison, he will continue to be our neighbor four houses down from us."

*Id.* at 00:53:00 (statement of Katie Reed).

Notably, the legislature's 2015 enactment of invasion of privacy in the first degree did not encompass

in-person observation of a nude victim for the purposes of arousing or gratifying the sexual desires of the person looking in a place where there is a reasonable expectation of privacy. That offense remains classified as second-degree invasion of privacy unless the provisions of ORS 163.701(1)(b) are met, which require previous convictions for related conduct. Indeed, the legislature could have chosen to elevate in-person observation to a felony, but it did not. Furthermore, it could have chosen to elevate the in-person observation of a child to a felony, but it did not.

The history set forth above is but a fraction of what could have been written, all of it consistent in its showing that the legislature has repeatedly considered this type of conduct—viewing others in a state of undress, in areas where they had a reasonable expectation of privacy like a bedroom or a bathroom, for sexual gratification—in the context of ORS 163.700. And the legislature repeatedly considered that conduct in situations involving alterations to the environment, such as drilling holes or installing hidden cameras, alterations far more significant than opening the doors of bedrooms or bathrooms, or pulling the shower curtain back, as we have here. It is rare, in fact, to find a legislative history so directly on point. The question, then, is what do we do with this history?

## III.  THE PRIMACY OF LEGISLATIVE INTENT

In the two competing theories of statutory interpretation—textualism vs. intentionalism, Oregon has clearly chosen a side: We are an intentionalist state.[4] The Oregon

---

[4] In using the term "intentionalist" I recognize that intentionalism is sometimes seen as a subset of a more general "purposivism." Purposivism, broadly, "reminds the judge *** that it is in Congress, not the courts, where the Constitution places the authority to enact a statute." Stephen Breyer, *Our Democratic Constitution*, 77 NYU L Rev 245, 266 (2002); *see also* Peter L. Strauss, Essay, *The Courts and the Congress: Should Judges Disdain Political History*, 98 Colum L Rev 242, 252-53 (1998) (arguing that purposivism makes courts the most effective agents of the legislature).

Some have sought to carve out intentionalism from purposivism by narrowing intentionalism to solely the statute's enacting legislature, disconnected from the more "general aim or policy which pervades a statute." Archibald Cox, *Judge Learned Hand and the Interpretation of Statutes*, 60 Harv L Rev 370, 370-71 (1947); *see* John F. Manning, *Textualism as a Nondelegation Doctrine*, 97 Colum L Rev 673, 677 & n 11 (1997) (discussing this distinction); *see also* Richard A.

legislature has mandated that "[i]n the construction of a statute, a court *shall pursue* the intention of the legislature." ORS 174.020 (emphasis added). In furtherance of ascertaining that legislative intent, we have many tools at our disposal.

We begin by looking to the text of the statute in context. A statute's "context" includes both its immediate context—the "phrase or sentence in which the term appears"— and the "broader context," which includes other statutes "on the same subject." *State v. Stamper*, 197 Or App 413, 417-18, 106 P3d 172, *rev den*, 339 Or 230 (2005). It is incumbent upon us to not isolate statutes, but to read them *in pari materia*, that is, as part of a unified set of policy choices made across the statutory landscape on a similar subject. *State v. Carr*, 319 Or 408, 412-13, 877 P2d 1192 (1994).

Context of a statute includes prior versions of the statute and related statutes. *State v. Webb*, 324 Or 380, 390, 927 P2d 79 (1996). It also encompasses prior judicial construction of the statute, and related statutes. *Young v. State of Oregon*, 161 Or App 32, 35, 983 P2d 1044, *rev den*, 329 Or 447 (1999). Similarly, subsequent changes to a statute are a relevant consideration in determining legislative intent. *See Halperin v. Pitts*, 352 Or 482, 490, 287 P3d 1069 (2012) ("Of course, the new subsections adopted in 2009 do not provide 'context' for the legislature's enactment of ORS 20.080(2) some 50-odd years earlier. But that does not mean that they are irrelevant." (Citation omitted.)). Nor are subsequent changes to related statutes irrelevant—they too are a pertinent consideration in divining the broader legislative intent, just as we can consider the legislative history of related statutes. *Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 415-16, 908 P2d 300 (1995), *modified on recons*, 325 Or 46, 932 P2d 1141 (1997).

Posner, *Statutory Interpretation—in the Classroom and in the Courtroom*, 50 U Chi L Rev 800, 817 (1983) ("The judge should try to think his way as best he can into the minds of the enacting legislators and imagine how they would have wanted the statute applied to the case at bar.").

As should be clear from my approach in this case, I believe Oregon tacks closer to purposivist intentionalism—a narrowed intentionalism merely being textualism *lite*. While this belief clearly animates my concurrence in this case, a fuller academic discussion I save for another day.

When a statute is subject to any plausible ambiguity, our search for legislative intent does not end with the words of the statute. As the Oregon Supreme Court has recognized on many occasions, the words of a statute are not the finite universe of consideration for, when read literally, words can be in conflict with the more general policy of the legislature, and it is incumbent on this court to give effect to the policy, not the literal application of language:

> "In construing a statute, courts must refuse to give literal application to language when to do so would produce an absurd or unreasonable result. Rather, courts must construe the statute if possible so that it is reasonable and workable and *consistent with the legislature's general policy.*"

*McKean-Coffman v. Employment Div.*, 312 Or 543, 549, 824 P2d 410, *adh'd to on recons*, 314 Or 645, 842 P2d 380 (1992) (citing *Pacific P. & L. v. Tax Com.*, 249 Or 103, 110, 437 P2d 473 (1968) (emphasis added)). *See also Beck v. Aichele*, 258 Or 245, 249, 482 P2d 184 (1971) ("It is a fundamental canon that '*** [i]t is the duty of the court in construing a statute to ascertain the intention of the Legislature and to refuse to give literal application to language when to do so would produce 'an absurd or unreasonable result,' but, rather, 'to construe the act, if possible, so that it is a reasonable and workable law and not inconsistent with the general policy of the Legislature.'"); *Mallon v. Employment Div.*, 41 Or App 479, 484, 599 P2d 1164 (1979) ("[I]n determining the meaning of the words used we can properly consider the legislative purpose and construe the language to reasonably accomplish this purpose. We may also presume the legislature did not intend the harsh results that a literal application of the statutory terms would seem to require.").

As the foregoing illustrates, the tools for statutory interpretation are multifold, and none is an island. When we become overly focused on textual choices, detached from context and legislative history, our interpretive process has become too narrow. Similarly, if we determine that the legislature has used wide-ranging, expansive, or "broad" terminology, that represents the *beginning* of our work, not the end.

The interpretation of a statute is not a formula. The methods and approaches we have created are but tools to an end, not an end of themselves. Ultimately, our fidelity cannot be to the mechanical application of a method, but to the pursuit of our ultimate objective: furthering legislative intent. As we have said:

> "In the final analysis, we acknowledge that this statute cannot be interpreted merely by the mechanical application of well-known principles of statutory construction. As we have endeavored to demonstrate, depending on which rules are given emphasis, different readings of the relevant statutes may be justified. And the law neglects to supply a rule for determining which rules should prevail. Ultimately, our interpretation of the statute is a judgment call based on our best estimation of what the legislature intended."

*Stamper*, 197 Or App at 426-27.

## IV.   APPLICATION

In applying the legislative history of ORS 163.670 and ORS 163.700, in conjunction with proper statutory interpretive methods, we must begin with a core truth: It is the role of the legislature, not the executive or judicial branches, to declare which acts are so offensive to society that they should be criminalized and to affix the corresponding severity, and level of penalty, for that act. *State v. Smith*, 128 Or 515, 524, 273 P 323 (1929) ("The power to declare what punishment may be assessed against those convicted of crime is not a judicial, but a legislative, power, controlled only by the provisions of the Constitution."). When we consider a motion for judgment of acquittal, we are necessarily engaged in statutory interpretation—asking if the evidence, viewed in the light most favorable to the state, falls within the universe of conduct the legislature contemplated when it enacted not only the specific statutory crime, but as it has constructed over time a comprehensive criminal statutory landscape that ascribes relative levels of severity and attendant punishment to conduct.

In this case, we are faced with two statutes. As detailed in *Carey-Martin*, the legislature enacted ORS 163.670 to combat the production of child pornography. *State v. Carey-Martin*, 293 Or App 611, 661, 430 P3d 98 (2018)

(James, J., concurring). In that case, we considered the issue of sexting, noting that the "legislature has never identified sexting as a social ill that it set about to deliberately criminalize, or affix a penalty to." *Id.* at 673. But, we noted:

> "To be sure, that behavior unquestionably can fall under the wording of ORS 163.670, but it does so not through deliberate legislative choice, but through historical happenstance. ORS 163.670, a law repeatedly enacted to target child pornography perpetrated as abuse against children, now can be read to criminalize voluntary sexting among young people due to the evolution of technology and social norms, not purposeful legislative action."

*Id.*

This is not *Carey-Martin*. In its original enactment of ORS 163.760, and in all subsequent amendments, there is not a single instance from the legislative record that shows the legislature, which sought to combat child pornography, ever envisioned the conduct at issue here as falling under the ambit of the statute. And while there is absolutely no example of the legislature ever contemplating the application of ORS 163.670 to the circumstances present in this case, the legislative record is replete, and explicit, that the legislature has repeatedly conceptualized this behavior under ORS 163.700, invasion of personal privacy. The very reason ORS 163.700 was enacted was because the legislature understood that, in 1997, no current statute criminalized the conduct, including ORS 163.670.

The Oregon legislature has, for many years—1997, 2001, 2009, and 2015—held public hearings, received testimony, debated, and enacted legislation to respond to factual circumstances nearly identical to those we have here: someone acting to enable the viewing of another, in a state of undress, in an area where they had a reasonable expectation of privacy, for sexual gratification. Never, once, over any of those years did the legislature ever express the belief that this conduct was punishable under ORS 163.670. There is no indication the legislature intended to leave it to prosecutors, or the courts, to choose between ORS 163.670 or ORS 163.700, with each being equally applicable. Unlike in *Carey-Martin*, where sexting arguably came under ORS

163.670 by happenstance, and not "purposeful legislative action," here, there is explicit "purposeful legislative action" criminalizing defendant's conduct under ORS 163.700 and affixing a severity of misdemeanor status, and an attendant penalty of one year in jail. To the extent that ORS 163.670 has become a viable prosecutorial choice for this conduct, it is as a result of our iterative case law.

And here I quibble with the majority when it states that "[o]ur goal in interpreting a statute is to discern the intent of the legislature in enacting the statute." Indeed, that is often our task. But sometimes we are tasked with more. ORS 174.020 demands that we "pursue the intention of *the legislature*." ORS 174.020 does not state "the legislature enacting the statute," it states "the legislature." Many times, perhaps even most times, the intent of the enacting legislature is the intent of the legislature, but sometimes we are called upon to place a specific statute within the context of the total statutory scheme the legislature, as a body existing across time, has created. That is the case here. For me, on the question of the application, on these facts, of ORS 163.670, the legislative history of ORS 163.700 answers the question *in pari materia*.

If we adhere to our mandate of intentionalism over textualism, we lack the authority to approach the question of ORS 163.670 with blinders on—whistling past ORS 163.700, even though it is a different statute, a subsequent sitting of the legislature enacted. Without question, the legislature can enact duplicative statutes. But we do not presume it does so; quite the opposite, our presumption is that the legislature does not. The presumption against the legislature enacting duplicative, yet divergent, criminal penalties is necessary to avoid a host of problems. "For a statute to attach criminal penalties to conduct, '[t]he terms of a criminal statute must be sufficiently explicit to inform those who are subject to it of what conduct on their part will render them liable to its penalties.'" *State v. Graves*, 299 Or 189, 195, 700 P2d 244 (1985). In addition to the requirements for notice, a criminal statute must not be so vague as to allow "a judge or jury unbridled discretion to decide" what conduct to punish. *State v. Cornell/Pinnell*, 304 Or 27, 29, 741 P2d 501 (1987). "A law that gives such unbridled discretion

to judges and juries offends * * * the principle against standardless and unequal application of criminal laws embodied in Article I, section 20, of the Oregon Constitution." *State v. Plowman*, 314 Or 157, 161, 838 P2d 558 (1992), *cert den*, 508 US 974 (1993).

Here, the sole reason ORS 163.670 and ORS 163.700 both became potential prosecutorial charges on these facts is due to our case law, not legislative intent. Any overlap is our creation, not the legislature's. On questions like these, we are but stewards of the legislature's intent. Authority is not given to the steward to deny the return of the king, and so, too, when iterative case law has developed our interpretation of one statute over time to reach a point where it now stands irreconcilable with the broader statutory framework the legislature envisioned, it is not our place to leave it to the legislature, or the Oregon Supreme Court, to fix it. In such an instance, barriers we may have erected through our court-created common law to revisiting precedent, or reconceptualizing an issue, must necessarily yield to our statutory mandate to "pursue the intention of the legislature." ORS 174.020.

Accordingly, I respectfully concur.

**POWERS, J.,** dissenting.

The majority opinion could be viewed as a subtle but significant shift in the role and function of this court. The majority opinion could instead be responding to a case that presents extraordinary circumstances that justify a departure from the traditional adversarial system of justice where the parties frame the issue to be decided by the court. Unfortunately, we do not know the precise reason or reasons why the majority opinion felt it was necessary to tread on ground that was not raised in the opening briefs. That is especially concerning because this case involves a question of statutory interpretation, and the legislature has not altered or modified the statutory framework in response to our prior decisions that the majority opinion now disavows. The opacity surrounding when the court will dispense with the parties' framing of the issues, silently disregard prudential rules of appellate procedure, and revisit statutory

interpretation decisions based on a constitutional challenge that we raised ourselves leads me to write separately.

Although defendant challenges the denial of his motions for judgment of acquittal on four counts of using a child in a display of sexually explicit conduct, ORS 163.670, and one count of attempted use of a child in a display of sexually explicit conduct, ORS 163.670 and ORS 161.405, he did not disagree with existing case law describing how a fact-finder determines whether there was sufficient evidence of a "lewd exhibition" for purposes of those crimes. Defendant's opening brief did not ask us to revisit any of our prior decisions, much less carry the burden to prove that any of our prior decisions are "plainly wrong" as described by *State v. Civil*, 283 Or App 395, 388 P3d 1185 (2017). *See also Dept. of Human Services v. K. W.*, 307 Or App 17, 34, 476 P3d 107 (2020), *rev den*, 368 Or 347 (2021) (explaining that "it is insufficient for a prior decision to be merely wrong; it must be 'plainly wrong,'" which is a "rigorous" standard that is "satisfied only in exceptional circumstances"). Starkly put, although defendant did not ask us to revisit whether "lewd exhibition" should be measured on a subjective basis—as described by the cases that we overrule or disavow today— the absence of that advocacy by defendant in the opening brief was no barrier for the majority opinion to adopt an objective standard. This approach, in my view, runs contrary to the adversarial process, which "functions most effectively when we rely on the initiative of lawyers, rather than the activism of judges, to fashion the questions for review." *New Jersey v. T.L.O.*, 468 US 1214, 1216, 104 S Ct 3583, 82 L Ed 2d 881 (1984) (Stevens, J., dissenting from an order directing reargument). Moreover, because the majority opinion's explanation for why it exercised its discretion to decide the case on an issue that defendant waived—by not including in his opening brief—is inadequate in my view, especially considering that this is in an area of statutory construction, I respectfully dissent.

I begin where there is common ground. I agree with the observation in the majority opinion that defendant assigned error to the trial court's denial of his motions for judgment of acquittal on the display and attempted display

counts, arguing that the legislature did not intend ORS 163.670 "to apply to the passive observation of a person undressing." 324 Or App at 717. It is at that point, however, where I part ways with the majority opinion. In my view, the majority opinion does not acknowledge, much less address, the context of defendant's argument in his opening brief.

Defendant made that argument as part of his contention that his conduct did not fall within ORS 163.670 because, in his view, he did not "permit" sexually explicit conduct, there was no exhibition, and he did not cause the victim to engage in sexually explicit conduct for a third party. No part of defendant's argument in the opening brief asked us to revisit our prior decisions in *State v. Meyer*, 120 Or App 319, 852 P2d 879 (1993); *State v. Evans*, 178 Or App 439, 37 P3d 227 (2001), *rev den*, 334 Or 76 (2002); or *State v. Smith*, 261 Or App 665, 322 P3d 1129, *rev den*, 355 Or 880 (2014). Indeed, defendant's opening brief accepted our interpretation of the term "lewd exhibition" articulated by the en banc court in *Meyer* that the term meant "exhibition with the intent of stimulating the lust or sexual desires of the person who views it." *Meyer*, 120 Or App at 326.[1] Concluding his

---

[1] In a lengthy footnote, the en banc court approved of the trial court's jury instructions and addressed the defendant's vagueness challenge:

"The trial court's instruction that defined 'lewd' for the jury is consistent with our interpretation:

"'Lewd—the term lewd or lewd exhibition as used in the law *** means an exhibition of the [genitals or] anus which is *meant to arouse the sexual gratification of the person observing the exhibition*, or which a reasonable person would know to be an exhibition, *the purpose of which is to arouse the sexual gratification of the person observing the exhibition or photograph*.' (Emphasis supplied.)

"Similar language was used to instruct on two elements of the crime of dealing in depictions of a child's sexual conduct:

"'And five, defendant knew that the photographs depicted [the child] in a pose showing her vagina or anus *for the purpose of arousing the sexual gratification *** or the desire of the defendant or persons to whom the photograph would be shown*.'

"'And six, that the depiction of [the child's] vagina or anus was a pose that a reasonable person would know to be a pose taken *for the purpose of arousing sexual gratification or desire of the person taking the photographs or some other person to whom the photographs would be shown*.' (Emphasis supplied.)

"In listing the elements of the crime of using a child in a display of sexually explicit conduct, the court also instructed the jury that the state had to prove beyond a reasonable doubt that

discussion of *Meyer*, defendant observes in his opening brief: "In short then, orchestrating or posing a child to engage in a photo shoot qualifies as an 'exhibition.' And obviously if the photo shoot depicts genitals, then it could also be 'lewd.'" That acknowledgment is meaningful. The majority opinion does not appear to address the context of defendant's argument in the opening brief, nor does it explain why it refashioned defendant's argument to decide whether the legislature intended a lewd exhibition to be assessed subjectively or objectively, which was not raised in the opening brief.

The case was argued before a three-judge panel in the normal course and taken under advisement to decide the issues framed by the parties. *See State v. McDonnell*, 329 Or 375, 389-90, 987 P2d 486 (1999) (explaining that "[a]djudication *** resolves legal and factual issues framed by litigants ***. Courts generally confine their judgments to the issues that the litigants have raised and submitted for decision."). Sometime later, the case was taken into full court as provided by ORS 2.570(5). And then, the case went sideways.

Rather than deciding the case on ground plowed by the parties' arguments, we pointed to new territory—which was at the time unexplored by the parties' briefing on appeal—to root our decision. We asked the parties seven questions, including whether *Smith* and *Evans* were plainly wrong under the *Civil* standard and "to what extent should this court consider case law from other states and the federal courts" when interpreting ORS 163.670. We invited optional supplemental briefs due 21 days later in anticipation of an

---

"'[t]he taking of the photograph or photographs was done to use the photographs *to arouse the sexual desire or gratification of the defendant or others*.' (Emphasis supplied.)

"Clearly, a person would not be prevented from producing or distributing pictures of minor children with their genitalia displayed for the purpose of having the pictures included in a medical textbook or an issue of, say, National Geographic. In those instances, the person would not possess the requisite intent that triggers the statutes' prohibitions. Furthermore, that activity is not the type of sexual exploitation or abuse that is targeted by the statutes."

*Meyer*, 120 Or App at 326 n 11 (bracketed text and emphasis by *Meyer* court).

en banc argument about a week after those optional briefs were due.[2]

In response to one of the court's questions, both parties engaged in an extended discussion about whether we should reach new arguments to overrule prior cases that were not raised in the opening brief. *See, e.g.*, *Dept. of Human Services v. A. F.*, 295 Or App 69, 433 P3d 459 (2018) (refusing to consider an argument to overrule prior cases because that argument was not made in the opening brief and limiting the court's analysis to the arguments made in the opening brief). Despite the parties engaging in that discussion, the majority opinion does little to explain why it exercised its discretion to reach new arguments to overrule prior cases that were not included in the opening brief. The economical explanation speaks volumes.

Instead of identifying situations when the court will exercise its discretion to reach an issue that has been waived by a party on appeal—and explaining why it was necessary that we do so in this case—the majority simply notes the "problematic nature of our case law" and invokes the principle articulated in *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) (observing that an appellate court is responsible for identifying the correct interpretation of a statute, "whether or not asserted by the parties"), to explain why it felt compelled to reconsider our earlier decisions. 324 Or App at 718-19. To me, that is not an explanation of why the court will decide a case on grounds not raised in the opening brief; rather, it is merely a response that the court has the discretion to do so. Indeed, *Stull* does not, in my view, stand for the proposition that we must assess potential constitutional challenges to our prior statutory interpretation decisions. Thus, it is difficult to understand what has changed since our first decision three decades ago, and the majority opinion provides no clues.

---

[2] To give that timing context, the opening brief was filed 229 days after the transcript was deemed settled, and the answering brief was filed 308 days after the opening brief. Thus, the parties took a total of 537 days to fully brief the case. The optional supplemental briefing that included a response to the court's question on whether we should overrule our prior case law was given just over 21 days to complete (since the briefs were due simultaneously).

Deciding the case on grounds not raised by the parties in the opening briefs without an adequate explanation sends destabilizing signals. Instead of answering the question posed by the parties, the majority opinion appears to tell the parties, the bar, and the public that it does not matter what a party asks us to decide. It does not matter that a party did not ask us to revisit a decision rendered by the full court 30 years ago. It does not matter that defendant did not raise a constitutional vagueness challenge to our prior interpretation of a statutory term. It does not matter that we affirmatively have declined to revisit our prior statutory interpretation decision and that the legislature has not taken any action to modify the statute after our first opinion interpreting ORS 163.670 (or any of our subsequent opinions relying on that interpretation). The approach taken by the majority opinion announces that it does not matter because the court will create those arguments itself. The court will revisit a settled question of statutory interpretation, create an unraised constitutional challenge, and then answer that new question by refashioning how a factfinder should determine whether there is sufficient evidence. Indeed, the majority opinion appears to stand for the proposition that the court will revisit its own cases *sua sponte* (Latin for "voluntarily" or "of one's own accord"), and the court will do so, apparently, with little explanation.

In my view, forging this new ground—as the majority opinion does—calls into question the future use of oft-cited prudential principles familiar to appellate practitioners. For instance:

- Normally, when a party does not renew an argument on appeal that it advanced before the trial court, we do not address it. *See, e.g.*, *Trent v. Connor Enterprises, Inc.*, 300 Or App 165, 169-70, 452 P3d 1072 (2019) (recognizing that the defendant did not reprise the argument advanced before the trial court and addressing the argument the defendant did raise on appeal); *Gambaro v. Dept. of Justice*, 247 Or App 609, 616, 270 P3d 377 (2012) (observing that, because the plaintiffs did not renew the arguments that they made before the trial court, the plaintiffs "have presented us with no basis to

reverse the trial court's dismissal of those claims, whatever their merits were in the trial court"). The approach taken by the majority opinion today suggests that a party need not worry about waiving an argument because the court may decide on its own to revive it.

- Normally, we do not address arguments raised on appeal for the first time in a reply brief. *See, e.g.*, *W. A. S. v. Teacher Standards and Practices Comm.*, 314 Or App 274, 279, 499 P3d 105 (2021) (explaining that, although the petitioner raised the issue before the administrative law judge and the agency, the petitioner did not raise the issue in the opening brief and waited for the reply brief). Now that the majority opinion treads on ground not raised at all in the opening brief, it is difficult to understand when the court will reject an argument raised for the first time on appeal in a reply brief.

- Normally, we do not develop a party's argument on appeal. *See, e.g.*, *Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to as clarified on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it our proper function to make or develop a party's argument when that party has not endeavored to do so itself."). Under the approach adopted by the majority opinion, a party need not advance any argument on appeal let alone develop that argument because the court may do so on a party's behalf.

- Normally, we do not overrule cases unless a party carries the burden of showing that it is "plainly wrong," which is a "rigorous standard grounded in presumptive fidelity to *stare decisis*." *Civil*, 283 Or App at 406. The majority opinion has signaled that the court will take on some of that burden and revisit an unchallenged prior decision or decisions by developing a constitutional challenge to justify its reinterpretation of a statute.

Any one of these prudential rules act as a check to the exercise of our discretion. They are not fixed barriers; rather, they function as guideposts to advance important goals of fairness to the parties (and potential intervenors and *amici*) and the efficient administration of justice. By not discussing what distinguishes this case from other cases (assuming, of course, that we will not approach every case in this manner), the majority opinion appears to create confusion on whether we would rely on one or more fundamental principles of appellate jurisprudence or whether we would dispense with those principles and reach into the trial court record to decide an argument that perhaps was raised before the trial court, but not renewed on appeal. Thus, in my view, the majority opinion sends destabilizing signals because it is unclear, based on our decision today, when these rules will prevail or in what circumstances these prudential rules will cede to the court's creativity in raising its own view of how a case should be decided.

Moreover, beyond jettisoning our own prudential rules, the majority opinion shows that we will revisit our determination of the "intention of the legislature," which has always been required by ORS 174.020 when interpreting statutes, despite the legislature not clarifying or changing the statute to advance its policy objectives. As noted earlier, it was the full court decision in *Meyer*—decided in 1993— that interpreted the statutory phrase "lewd exhibition" to mean "exhibition with the intent of stimulating the lust or sexual desires of the person who views it." 120 Or App at 326 (footnote omitted). The legislature did not alter or modify the statutory framework after we announced that a factfinder should use the subjective intent of the person to assess whether a situation qualifies as a lewd exhibition for purposes of the definition of "sexually explicit conduct" in ORS 163.665(3). Decades have elapsed with no action by the legislature in this area.

The Supreme Court has explained that *stare decisis* is at its zenith when it comes to statutory construction. *Farmers Ins. Co. v. Mowry*, 350 Or 686, 697, 261 P3d 1 (2011). The court explained:

> "After we have interpreted a statute, the legislature's constitutional role allows it to make any change or adjustment in the statutory scheme that it deems appropriate, given this court's construction of the statute (and, of course, subject to constitutional limitations). The legislature can—and often does—amend a statute that this court has interpreted to clarify or change the statute or otherwise to advance the policy objectives that the legislature favors."

We have explained that the weight of *stare decisis* "is especially strong when the statutory interpretation at issue comes from an intermediate appellate court. In such instances, there is not one, but two, bodies capable of correction—the legislature, and the Supreme Court." *State v. Merrill*, 303 Or App 107, 120, 463 P3d 540 (2020) (emphasis omitted). None of that appears to matter—or if it does matter, the majority opinion does not endeavor to discuss why it chose to revisit the intention of the legislature despite the legislature's inaction after *Meyer*, *Evans*, or *Smith*. The majority opinion does not discuss any recent case that animates its desire to raise a constitutional challenge to our prior interpretation of the statute and then resolve that constitutional challenge by disavowing our earlier cases. Thus, this case is unlike *State v. Prophet*, 318 Or App 330, 342, 507 P3d 735, *rev den*, 370 Or 472 (2022), which addressed "our conflicting and inconsistent case law" and was decided shortly after the Oregon Supreme Court addressed the same issue in *State v. Owen*, 369 Or 288, 505 P3d 953 (2022).

A healthy respect for the distribution of powers among coordinate branches of government would seem to caution against taking it upon ourselves to revisit a question of statutory construction without explaining what has changed since we first determined the legislature's intention and why we must revisit that decision despite no signal from the legislature or any other change in the law that suggests our prior interpretation was plainly wrong.[3] Our decision

---

[3] Article III, section 1, of the Oregon Constitution provides:

"The powers of the Government shall be divided into three [separate] departments, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these departments, shall exercise any of the functions of another, except as in this Constitution expressly provided."

to engage in a reexamination of our prior cases should not rest on the current composition of the court and the individual proclivities of the judges; rather, our decision should be ground in the law. *See generally Couey v. Atkins*, 357 Or 460, 485, 355 P3d 866 (2015) (identifying circumstances when a court may overrule precedent without violating *stare decisis* principles and explaining that the court may not "revisit a prior decision merely because the court's current members may hold a different view than its predecessors about a particular issue").

Indeed, we have turned away opportunities to revisit the issue of what constitutes a lewd exhibition for purposes of the definition of "sexually explicit conduct" in ORS 163.665(3). In *State v. Ritchey*, 257 Or App 291, 292, 304 P3d 51, *rev den*, 354 Or 342 (2013), the defendant challenged the denial of his motions for judgment of acquittal arguing that "the state failed to offer sufficient evidence to prove that the images were of 'sexually explicit conduct'" as that term is used in ORS 163.665(3).[4] Although not discussed in our *per curiam* opinion, the parties' briefs describe the three digital images that were entered into evidence and formed the basis of the defendant's convictions: (1) a nude girl standing in a field grinning at the camera; (2) a nude girl, who was not looking at the camera, sitting on the edge of a swimming pool with her legs in the water; and (3) a cropped image of the first image of the girl in the field that showed only her nude torso from her neck to her thighs. We summarily rejected the defendant's invitation to revisit our prior interpretation of what constitutes "lewd exhibition" as that term is used in the definition of "sexually explicit conduct." The *Ritchey* court explained, "We reject [the defendant's] argument based on our decision in" *Evans*, "in which we considered and rejected, over a dissent, a similar argument." *Ritchey*, 257 Or App at 292. Thus, not only has the majority opinion not explained what changed since

---

[4] Although the defendant's convictions at issue in *Ritchey* were different than the ones at issue in this case, both cases involve crimes that use the term "sexually explicit conduct," which is defined by ORS 163.665(3)(f) to include "lewd exhibition of sexual or other intimate parts." *Compare* ORS 163.684 (encouraging child sexual abuse in the first degree) and ORS 163.686 (encouraging child sexual abuse in the second degree) *with* ORS 163.670 (using a child in a display of sexually explicit conduct).

our 1993 decision in *Meyer*, but it also does not explain what has changed since our 2013 decision in *Ritchey* to justify revisiting our existing case law.[5]

To be sure, we asked the parties to weigh in on a new statutory interpretation approach that would undo our prior cases. It is, of course, possible that we did not correctly encapsulate the intention of the legislature in our 1993 *Meyer* decision and that lewd exhibition should be measured solely by reference to objective standards and aided by factors like those articulated in *United States v. Dost*, 636 F Supp 828 (SD Cal 1986), *aff'd sub nom United States v. Wiegand*, 812 F2d 1239 (9th Cir 1987). Maybe our prior decisions left the statutory framework susceptible to a successful constitutional challenge that the legislature did not address in its multiple amendments to the statutory framework since our decisions in *Meyer*, *Evans*, and *Smith*. In this case, however, defendant's arguments did not put that issue before us. Instead of waiting for a case to present a constitutional challenge to our statutory interpretation in those cases, the majority opinion replaces defendant's arguments with its own to reinterpret what the legislature meant in 1985.[6]

For these reasons, I respectfully cannot join the majority opinion and its exercise of discretion to ground its decision on disavowing our prior cases when defendant waived that argument by not including it in his opening brief. In my view, judicial discretion should "be exercised according to fixed legal principles in order to promote substantial justice." *Elliott v. Lawson*, 87 Or 450, 453-54, 170 P 925 (1918). The foray into territory abandoned by defendant

---

[5] Moreover, the new approach adopted by the majority opinion to determine whether there is "sexually explicit conduct for any person to observe or to record" means that the digital images at issue in *Ritchey* may no longer qualify as "sexually explicit conduct."

[6] It is not lost on me that prudential rules and the slow pace of change often weigh heavier on some people and can be frustrating. On the other hand, a court that independently chooses to revive a waived argument—rather than signal that in a future case it would consider such arguments—risks the perception that it has stepped outside its role as an error-correcting court if its action is not adequately explained. *See State v. Pemberton*, 226 Or App 285, 291, 203 P3d 326 (2009) (Wollheim, J., dissenting) ("Because we are an error-correcting court, we do not make arguments for the parties that they should have made but did not make.").

on appeal does not promote substantial justice; rather, the majority opinion, in my view, sends a destabilizing message about when the court will ignore the arguments presented in the opening briefs and decide the case on grounds the court chooses on its own. Our failure to provide a thorough explanation to support our exercise of discretion and any guideposts for what sort of cases we will do so again in the future appears to subtly shift the role of the court away from neutral arbiter. Although I do not quibble with the existence of the authority to do so in extraordinary circumstances— such as when there are jurisdictional concerns or to consider a significant change in controlling legal authority or when the ends of justice will not otherwise be satisfied—the majority opinion has not, in my view, sufficiently explained why it developed defendant's argument for him and disavowed our existing cases.

Accordingly, I respectfully dissent.[7]

Shorr, J., joins in this dissent.

---

[7] If we were writing on a clean slate and the arguments were properly before us, much of the approach advocated by Judge Hellman's thoughtful separate opinion makes sense to me. Given the procedural posture of this case, however, I do not join that opinion. We are not writing on a clean slate and our existing case law, in my view, provides answers to defendant's challenges that he did raise in the opening and supplemental briefs.

Briefly stated, defendant does not dispute that there was sufficient evidence for a factfinder to conclude that he viewed or attempted to view the victim's nude or partially nude body to satisfy his sexual desires; rather, he appears to argue that there was no exhibition—lewd or otherwise—because he passively observed the victim. The record, however, demonstrates that defendant's acts, including removing barriers to allow himself to look at the victim's sexual or intimate parts, made the victim's otherwise ordinary conduct into an exhibition and defendant's sexual intent made it lewd. *See Meyer*, 120 Or App at 326; *Smith*, 261 Or App at 677 (explaining that whether an exhibition is lewd depends on the intent of the person charged under the statute). To the extent that defendant's argument suggests that "mere nudity" does not constitute a lewd exhibition, we have previously rejected that argument. *See id.* at 667 (rejecting the defendant's contention "that 'mere nudity' does not constitute a lewd exhibition and that this court's interpretation of lewd exhibition in [*Evans*] was wrong and should be overruled"); *see also United States v. Knox*, 32 F3d 733, 747 (3d Cir 1994) (applying the *Dost* factors, among other considerations, and concluding that "lascivious exhibition of the genitals or pubic area" of a minor can include fully clothed minors and "requires only that the material depict some 'sexually explicit conduct' by the minor subject which appeals to the lascivious interest of the intended audience").

Finally, perhaps some of the difficulty in determining whether there was a "lewd exhibition" arises from the dissonance between a colloquial concept of what constitutes child pornography (*e.g.*, posed photos or video) and what happened here (*i.e.*, a lone defendant viewing, in person, an already naked child's

**MOONEY, J.,** dissenting.

I am not persuaded by defendant's contentions that the trial court erred in denying his motions for judgment of acquittal. I do not agree that his sentences are unconstitutional. I would not reverse based on defendant's claim of plain error regarding merger. I would affirm the judgment on appeal in all respects and, therefore, I dissent.

**HELLMAN, J.,** dissenting.

As the majority correctly concludes, criminal culpability under ORS 163.670 does not depend solely on a defendant's thoughts or subjective state of mind. Such a law would be unconstitutional. 324 Or App at 723-24. That conclusion is compelled by the United States Constitution and United States Supreme Court case law. There is also no indication that our legislature sought to craft such a law when the text of the statute and the legislative history are considered. 324 Or App at 719-26.

The majority also correctly concludes that a lewd exhibition requires more than mere nudity. 324 Or App at 721. Again, that conclusion is compelled by the United States Constitution and United States Supreme Court case

---

breasts, vaginal area, and buttocks with the intent of stimulating his own sexual desires). To remove some of the implicit associations that the term "child pornography" may trigger and demonstrate whether an individual's in-person viewing of an already-naked child can ever be a "lewd exhibition," consider the following hypothetical:

> Imagine that an individual had taken the same actions that defendant took in the shower incident—going into the closed bathroom while his daughter was showering, opening the shower curtain, holding the curtain open, staring at his daughter's breasts, and ignoring her protestations and admonishments to leave—but did so while recording a video of what he saw with his smart phone.

In that hypothetical scenario, where the individual is taking the same actions as defendant did in this case but also happens to be producing a video recording, it may be easier to conclude that the individual created what colloquially is known as child pornography. The display statute, however, does not require a visual recording. *See* ORS 163.670(1) ("A person commits the crime of using a child in a display *** if the person *** permits *** a child to participate or engage in sexually explicit conduct for any person to observe or to record in a visual recording."). The statutory requirements are satisfied if the lewd exhibition was "for any person to observe" or "to record in a visual recording." In my view, because there was sufficient evidence to conclude that defendant was an observer of a lewd exhibition, the trial court correctly denied defendant's motions.

law and is confirmed by the text of the statute and the legislative history. 324 Or App at 728.

I also agree that we were mistaken in *State v. Smith*, 261 Or App 665, 678, 322 P3d 1129, *rev den*, 355 Or 880 (2014) when we wrote out any objective element for lewd exhibition by adding the language "as determined from the perspective of the person charged under the statute" to the definition that we established in *Meyer*. 324 Or App at 732.

I further wholeheartedly agree with the majority's recognition of the *Dost* factors as a useful tool in this area of law. 324 Or App at 733-35. In my view, both as a legal and practical matter, objectivity requires an agreed-upon analytical framework as a starting place. In this context, a definition of "lewd exhibition" is not enough. Leaving the question of what is "salacious or focused on sex," 324 Or App at 721, to the individual factfinder to sort out without guidance carries the same risk as a purely subjective standard; specifically, that guilt or innocence will be decided in an arbitrary manner.

However, I dissent from the disposition in this case on Counts 1 through 5 because even with an objective component in the analysis, the prosecution's case here survives a motion for judgment of acquittal and was correctly submitted to the jury. I would thus affirm on Counts 1 through 5.

Because this case comes before us after the denial of a motion for judgment of acquittal, "we view the facts and reasonable inferences therefrom in the light most favorable to the state *** to determine whether a rational factfinder could have found each element of the offense to have been proved beyond a reasonable doubt." *State v. Cazee*, 308 Or App 748, 762, 482 P3d 140 (2021) (internal citations omitted). Under that standard, here are the facts that relate to defendant's views of M's naked body in her bedroom (Counts 1, 2, 3, and 5):

At the relevant times, M was between 11 and 15 years old. After M took a shower, she would walk to her room in a towel, close the door, take off the towel, and be naked in her room before she got dressed. At least once a week, a couple of minutes after M got into her bedroom, defendant would

open the door and come in. M would be naked or dressed only in underwear when defendant entered. M's room was small, so defendant would be standing near M when he was in the room. Defendant could open M's door at will because he had removed the lock so she could not shut him out. Defendant knew when M took a shower, and he knew that she would be naked or partially clothed afterwards. When he first came in the room, defendant did not look at anything except M. Defendant looked at M's naked body, and specifically looked at her breasts, vagina, and butt. He did so by looking directly at her body and by looking at the image of M reflected in a mirror. In response to defendant's observation of her naked body and intimate parts, M would grab her towel and try to cover up, but the towel would only cover her front. If she was naked, it would leave her butt exposed. M would then sit down on the bed to try and cover her butt. M would also tell defendant to leave, but he would refuse, saying "that's why he paid the rent" so that he could do whatever he wanted. Defendant would stay in M's room, pretending to fix things, and would continue to look at M's breasts, vagina, and butt, whichever were visible, as long as he was in there.

Here, there was sufficient evidence for a factfinder to conclude that there was a lewd exhibition. The focal point of the depiction was on M's breasts, vagina, and butt—the body parts that defendant stared at directly and repeatedly. M was in a place (her bedroom, sitting on her bed) and in a state of undress (naked or partially covered in a towel or underwear) that are both generally associated with sexual activity, and therefore created a depiction that was sexually suggestive. In addition, M's attire in that depiction (partially clothed in a towel or in her underwear) was inappropriate given that she was 15 years old. The evidence is also sufficient to find that defendant designed the depiction, through his knowledge and exploitation of M's schedule, his removal of locks to her bedroom door, and his unrestricted entry into her bedroom because "that's why he paid the rent." Finally, a factfinder could conclude that the intent of this depiction of a naked or partially clothed 15-year-old girl after a shower was for a sexual response in the viewer.

In sum, a factfinder could view the evidence in this record to support a conclusion there was a lewd exhibition

in this case. Having concluded that there was sufficient evidence to find a lewd exhibition in this case, I then turn to the remainder of the statutory analysis.

We previously have observed that the legislature intended "permit" to convey the meaning of "allow" or "make possible." *State v. Porter*, 241 Or App 26, 30, 249 P3d 139, *rev den*, 350 Or 530 (2011). What a person must "permit" under the statute is a child's participation or engagement in sexually explicit conduct for the purpose of observation or recording. *Cazee*, 308 Or App at 763.

Here, a factfinder could conclude that defendant made possible M's participation in a lewd exhibition for the purpose of his observation.[1] Private conduct becomes a showing when someone sees it, and as explained above, a factfinder could conclude that the showing was "itself salacious or focused on sex." *See* 324 Or App at 721. We have held that a person need not exercise the person's own volition to be a participant in sexually explicit conduct; rather, "a person can become a participant by virtue of another participant's actions." *State v. Bates*, 304 Or App 732, 746 n 7, 472 P3d 768 (2020) (internal quotation marks omitted). Thus, the trial court did not err when it denied defendant's motion for a judgment of acquittal on Counts 1, 2, 3, and 5.

Defendant was also charged in Count 4 based on his view of M in the shower. In the light most favorable to the state, here are the facts about that episode: Once when

---

[1] In *State v. Torres*, 319 Or App 513, 514, 511 P3d 85 (2022), we accepted the state's concession that under *Cazee*, 308 Or App 748, the defendant did not permit the sexually explicit conduct when he set up hidden cameras in his girlfriend's daughter's bedroom, which captured videos of the naked teen. The state has not conceded the issue in this case. Moreover, both *Torres* and *Cazee* were missing the kind of direct link between defendant's actions and the sexually explicit conduct that the statute requires. In *Cazee*, the "sexually explicit conduct" was sexual intercourse, which was already occurring when the defendant looked through the uncovered window to view it. In other words, the defendant in *Cazee* did nothing to bring about the minors' involvement in sexually explicit conduct. In *Torres*, there was insufficient evidence of a direct link between the defendant's conduct in placing the camera and the victim's sexually explicit conduct. Again, the defendant did not directly permit any sexually explicit conduct. In contrast, in this case, a jury could conclude that defendant's direct interactions with the victim allowed or made possible her participation in sexually explicit conduct in the form of a lewd exhibition.

M was 15 years old, she was washing her hair in the shower with the shower curtain closed. Defendant entered the bathroom and partially pulled back the shower curtain and talked to M. M agreed that defendant was in the bathroom to talk to her about something but could not recall what it was. When defendant pulled back the shower curtain, he used both of his hands to form a half-circle that exposed the top half of M's body from her breasts up. M told defendant to get out, but defendant remained, still talking to her for a minute and a half. For part of the time, defendant's eyes moved up and down over M's exposed body. M knew he was staring at her breasts because of where his eyes were focused.

The shower incident is a much closer call, but there was sufficient evidence to defeat defendant's motion for judgment of acquittal. Although washing one's hair in the shower is not generally associated with sexual activity, defendant's observation of M was not limited to that view. A factfinder could conclude that defendant positioned the shower curtain to create a focus on M's breasts. M testified that she could tell defendant was looking at her breasts because of where his eyes were focused. A focus on a 15-year-old's exposed breasts is inappropriate for her age and sexually suggestive. A jury could thus conclude that this was a lewd exhibition.

It is in the analysis of the shower incident that best demonstrates how a set of factors can be useful in these kinds of cases. We know that defendant himself had a sexual interest in M because of his other actions such as his hands-on sexual abuse of her, and it is a reasonable inference that his motive for moving the shower curtain aside and viewing M's naked body was to elicit a sexual response in himself. It would be all too easy then to shortcut the legal analysis because what defendant did was seriously wrong. Using a set of factors guards against that kind of decision-making because it keeps the focus on the depiction itself when determining whether it amounted to a lewd exhibition. Although the evidence was sufficient to survive a motion for judgment of acquittal, the jury would be well within reason to view the evidence as not supporting a conviction. But on this record, that is the jury's decision to make.

As with the bedroom incidents, a factfinder could conclude that through his actions in the shower incident, defendant made possible M's participation in a lewd exhibition for the purpose of his observation. Therefore, the trial court did not err when it denied defendant's motion for a judgment of acquittal on Count 4.

In sum, even under the majority's definition of lewd exhibition under ORS 163.670, in the light most favorable to the state there was sufficient evidence to survive a motion for a judgment of acquittal.

That brings me to defendant's arguments that his sentence is unconstitutionally disproportionate under Article I, section 16, of the Oregon Constitution and *State v. Rodriguez/Buck*, 347 Or 46, 217 P3d 659 (2009). That is an extremely high bar to meet, and necessarily so. As the Supreme Court recognized, disproportionality is found only in "rare circumstances" and the inquiry seeks to balance the legislature's "central role" in "establishing penalties for crimes" with the judicial function to ensure that those penalties do not violate constitutional principles. *Id*. at 58.

In a proportionality analysis, we (1) compare the severity of the penalty to the gravity of the offense; (2) compare the penalties for other related crimes, and (3) assess the defendant's criminal history. *Id.* Here, a comparison of the penalties for related crimes weighs in favor of a finding of disproportionality. As we held in *State v. Carey-Martin*, 293 Or App 611, 630, 430 P3d 98 (2018), "[a] 25-year imprisonment sentence is an extremely severe penalty." Had defendant been convicted of invasion of personal privacy in the second degree under ORS 163.700, he would have received a sentence of less than a year in prison, and he received less time for his hands-on abuse of the victim than he did for viewing her naked.

However, the gravity of defendant's actions (he affirmatively exercised his power and control as the victim's father to remove barriers, including locks, to repeatedly view her naked, despite her protests) and his criminal history (including his physical abuse and hands-on sexual abuse of the victim) lead me to a conclusion that the sentence here would not "shock the moral sense of reasonable

people," which is the ultimate question to answer. *See Carey-Martin,* 293 Or App at 633 (quoting *State v. Wheeler*, 343 Or 652, 670-71, 175 P3d 438 (2007)).

My conclusion that the defendant in this case did not demonstrate an unconstitutionally disproportionate sentence does nothing to alleviate my serious concerns with the statutory scheme as it currently exists. What I find deeply troubling about all of this comes from the interplay of the broad scope of criminal liability under ORS 163.670 and the mandatory nature of punishment for such a conviction. A second conviction under the statute results in a mandatory minimum sentence of 25 years imprisonment under ORS 137.690, no matter what the specific conduct was, and no matter if the "prior" conviction occurred in the same case. That is, the sentencing structure gives no recognition for the broad range of conduct that can come under the statute's grasp. Thus, someone who induces a child to have sex with several men, and films it, *see State v. Howe*, 273 Or App 518, 359 P3d 483 (2015), is given the same sentence as someone, like the defendant in this case, whose criminal conduct was to take actions that allowed him to view his daughter naked in her room and the shower. By failing to differentiate between the severity and moral culpability of conduct captured by ORS 163.670, the current sentencing structure is not fair or just. The burden should not be on individual defendants to meet a nearly insurmountable burden to prove that their sentence rises to the level of "unconstitutionally disproportionate" before they are given a sentence that is fair and just in light of their actual conduct. In my view, the burden is squarely on the legislature to craft a sentencing scheme that produces fair and just sentences.

The legislature has many tools available for that task, including rewriting the statute to create different levels of criminal liability and punishment that reflect the real-world differences in conduct or simply by removing the mandatory nature of the sentence. Either approach would result in punishments that fairly and appropriately address the specific acts that are deemed criminal under ORS 163.670, or whatever statutory scheme the legislature chooses to enact.

Either approach would also have the effect of being a check on prosecutorial charging discretion, which is another reason I believe the legislature needs to take prompt action in this area. I am unaware of any statewide policies that guide a prosecutor's choice to charge under ORS 163.670, a Class A felony, instead of ORS 163.700 and ORS 163.701, which criminalize an invasion of personal privacy as a Class A misdemeanor or Class C felony. That is a concern, because there is overlap in those statutes. Thus, in some factual situations a person could be charged under either scheme, despite the vast differences in liability and punishment that flow from such a decision. In my view, that situation creates a very real risk of causing arbitrary results that depend less on a defendant's conduct (where the focus belongs) and more on the individual choices of whichever particular prosecutor happens to be assigned to the case. Without boundaries on charging discretion, there is a significant risk of unacceptable unfairness in this area of the law. Our criminal justice system should not tolerate that risk.

And yet, despite those serious concerns with the statutory framework as it currently exists, defendant's conduct in this case was within the scope of ORS 163.670. I also conclude that defendant's sentence is not constitutionally disproportionate under the Supreme Court's *Rodriguez/ Buck* test. I therefore dissent from the majority's decision to remand with instructions to grant defendant's motion for a judgment of acquittal on Counts 1 through 5.

Finally, I dissent from the majority's disposition on Counts 6, 7, 8, and 9, because any error in failing to merge the counts is not plain. Plain error requires that there be a legal error that is obvious and not reasonably in dispute. *See, e.g.*, *State v. Vanornum*, 354 Or 614, 629, 317 P3d 889 (2013). To accept defendant's arguments that merger was required, we must accept his interpretation of case law and his characterization of how he was charged in this case, both of which are at odds with the way in which the state views the current state of the law and the facts in this case. Notably, the majority does not adopt either party's legal analysis, but instead finds plain error based on an altogether different legal analysis. That legal analysis includes citation to a Supreme Court case that neither side

references and use of our case law in a way that neither side advocates. The majority may very well be correct that defendant's convictions should merge. But granting plain-error review does not turn on the correctness of the underlying issue. If there are two ways to read the same record and three different legal analyses that possibly apply, then any error is not plain. I would therefore not reach defendant's eleventh and twelfth assignments of error.

I respectfully dissent.

Tookey and Joyce, JJ., join in this dissent.